JACOB EISEMAN, Individually and as Administrator of the Estate of RHONA EISEMAN, Deceased, et al., Respondents, v STATE OF NEW YORK, Appellant. (Appeal No. 1.)

MICHAEL P. SCHOSTICK, Appellant, v STATE OF NEW YORK, Respondent. (Appeal No. 2.)

Fourth Department, June 4, 1985

**APPEARANCES OF COUNSEL**

*Robert Abrams, Attorney-General* (*Michael Buskus* and *Peter J. Dooley* of counsel), for State of New York.

*Lipsitz, Green, Fahringer, Roll, Schuller & James* (*Richard P. Weisbeck, Jr.,* and *Frank S. Kedzielawa* of counsel), for respondents in Appeal No. 1 and appellant in Appeal No. 2.

*Covington & Burling* and *Sheldon Elliot Steinbach* for American Counsel on Education, *amicus curiae.*

### OPINION OF THE COURT

DENMAN, J.

█ Larry Campbell was conditionally released from Fishkill Correctional Facility on December 19, 1975 and enrolled as a student at the State University College at Buffalo in a program for the economically and educationally disadvantaged designated under the acronym SEEK (Search for Education, Elevation and Knowledge). He lived in a dormitory on campus with the son of his sponsor for the program, a professor at the college, through whom he became friends of Rhona Eiseman, Thomas Tunney and Teresa Beynard, fellow students, and Michael Schostick, a nonstudent. On June 9, 1976, at an apartment approximately one block from the college, Campbell murdered Tunney, raped and murdered Eiseman, and inflicted serious bodily injuries on Schostick by stabbing him six times. Beynard managed to escape. Schostick brought a claim for personal injuries which was joined with the claim of Jacob Eiseman as representative of his daughter's estate, and Jacob and Yetta Eiseman individually, for personal injuries, conscious pain and suffering, and wrongful death. Claimants seek to impose liability on the State, asserting that the State, through its various agents, was negligent in (1) failing to inquire into Campbell's background to determine his qualifications and suitability for admission to the college; (2) failing to inform college officials of Campbell's history of psychiatric disorders and heroin abuse; (3) releasing Campbell from prison and failing to impose precautionary conditions; (4) failing to provide adequate parole supervision and failing to revoke his parole. Of the various theories advanced by claimants, we agree with the well-reasoned decision of the trial court and find the State liable on the Eiseman claim for failure to inform the college of Campbell's history of

mental illness and drug abuse and for the college's failure to inquire into Campbell's suitability for admission.

## CAMPBELL'S CRIMINAL RECORD

Campbell's incarceration resulted from reduced pleas in satisfaction of three separate indictments for which he was sentenced to a maximum of six years. On the first indictment it was charged that he robbed a motorist at gunpoint, ordered him out of his car and took the car. When the police apprehended him they found a loaded .32 caliber revolver and 77 decks of heroin. On the second indictment he was charged with attempted murder, attempted assault in the first degree and robbery in the first degree resulting from an incident in which he and other individuals robbed a woman of $26, threw her to the ground and fired a pistol, creasing her skull. The third indictment involved a charge that Campbell and another entered a drug "shooting gallery," robbed the occupants, stripped a woman of her clothes in view of the men present, struck her about the face and body, beat her with an electric wire and inserted his hand into her vagina. When one of the men began to lower his hands, Campbell stabbed him several times in the stomach with a knife. In satisfaction of those indictments, Campbell was allowed to plead to criminal possession of a dangerous drug in the fourth degree and received a maximum sentence of six years.

Prior to those indictments, Campbell had been arrested approximately 25 times, charged with a variety of crimes including assault, robbery and a number of drug-related crimes. Each time he was released on parole he immediately reverted to his heroin abuse which led to other crimes and violations of parole. A heroin abuser since 1959, he was using up to 25 bags a day while not incarcerated.

## CAMPBELL'S PSYCHIATRIC HISTORY

Between June 1970 and February 1972 Campbell was remanded to Bellevue Hospital five times for psychiatric examination. The diagnosis then, as it continued to be throughout many psychiatric examinations thereafter, was that he suffered from chronic schizophrenia, paranoid type, with an impulsive-explosive personality, a high criminal potential, a high mental pathology potential and a low rehabilitation potential. During his incarceration from 1972 through 1975, a series of psychological evaluations revealed that he had a potential for killing, that he acted impulsively, that he was belligerent, demanding, threatening, uncooperative and disruptive with poor judgment and insight. His applications for a temporary release program

and for early parole were denied on the ground that he was aggressive, unstable and a poor risk. After absconding from a work release program, he was to be transferred to a maximum security facility. While awaiting transfer, he attempted suicide. Subsequently, in October 1975, two months before his release, he experienced an acute psychotic episode in which he exhibited bizarre and inappropriate behavior and thinking, was disorganized, disassociated and suffered visual and auditory hallucinations. In November 1975 the diagnosis was "Acute Schizophrenia Episode (in remission)."

### THE ADMISSIONS PROCESS

In January 1975 Campbell submitted his application for enrollment in the SEEK program at the college. In the application he recited his present address (Albion Correctional Facility), his former address (Auburn Correctional Facility) and that he had obtained his high school equivalency diploma at Clinton Correctional Facility. The application required the listing of three people who personally knew the applicant and who would recommend him for the SEEK program and suggested that the person should be an "Employer, Pastor, Teacher, Principal, etc." One of Campbell's references was his fiancée and two were residents of Buffalo, where Campbell had never lived, who had no opportunity to make the kind of observations and judgment as to Campbell's character and fitness which were obviously relevant to admission. In conjunction with the application, Campbell submitted a health report and physicians' certificate which had been prepared by Dr. John P. Fernandez, the examining physician at the Albion Correctional Facility. In answer to the question on the health report, "Is there any evidence of anxiety or other tension states or emotional instability?", Dr. Fernandez answered, "No." Under the heading "Prior Conditions and Diseases," Dr. Fernandez failed to indicate Campbell's long history of abusing heroin and other drugs. No response was given to the question, "Have you ever been under the care of a psychiatrist?"

Although Campbell was denied early parole in July 1975, he was admitted into a temporary release program through which he anticipated beginning the fall semester at the college. However, he absconded from a work site, took a car and drove to Buffalo. As a result, he was removed from the temporary release program at Albion, and, while awaiting transfer to Auburn, attempted suicide. He was then sent to the diagnostic and evaluation unit at Fishkill. He wrote to his SEEK counselor telling him of his suicide attempt and of problems he was having

in prison, and requesting a leave of absence from the college so that he could enter in the semester beginning January 1976. The SEEK counselor wrote to Campbell informing him that he was on official leave of absence and would be expected to "return" for the semester beginning in January. Despite receiving the information of Campbell's suicide attempt and his problems with prison authorities, college officials made no attempt to check into Campbell's background or emotional stability.

### FAILURE TO INFORM THE COLLEGE OF THE DANGER CAMPBELL PRESENTED

Despite the extensive record of severe psychiatric disorder contained in Campbell's prison record, to which Dr. Fernandez had access, Fernandez indicated that there was no evidence of emotional instability. The only conclusion to be drawn is that Fernandez did not examine Campbell's medical record. He thus misled the college regarding Campbell's mental stability. Fernandez was under a duty to respond accurately to the questionnaire, a duty which extended to the college community. The State argues that if there was any duty on the part of Dr. Fernandez, it was a duty which ran only to "the college" and not to its students. That misperceives the nature of a college entity. A college is not a complex of buildings nor its administrative officials but is comprised of those students which attend it, the administrative officials being there merely to facilitate the education of the students.

Fernandez' failure to reply accurately on the health report was a contributing cause of the tragedy. If the college officials had been apprised of Campbell's long history of violence, explosive antisocial conduct and heroin abuse, they very likely would have rejected his application on the ground that his participation and presence in college life would impose an undue risk of harm to the college community. A terrible irony noted by the trial court was that only days previous to Fernandez' filling out the health report, other corrections officials had denied Campbell's application for temporary release for another educational program on the grounds that his "aggressive antisocial conduct in the community, combined with narcotic drug abuse and absconding from parole supervision make him a poor risk." If the information on which that conclusion was based had been communicated to the college, there can be little doubt that Campbell would have been denied admission on the ground that he was "a poor risk". Fernandez' failure to report accurately was negligent and that negligence was a proximate cause of the injury to Rhona Eiseman. Although it is clear that a duty

existed with respect to members of the student body, such duty did not run to Schostick, a nonstudent, and the State cannot be held liable to him for the negligence of Fernandez.

### THE NEGLIGENCE OF THE COLLEGE

■ The failure of Fernandez to inform the college of Campbell's psychiatric history does not absolve the college from its negligence in admitting Campbell. We should note initially that, under the circumstances here, claimants may not recover for the college's failure to afford adequate police protection because there was no special relationship giving rise to liability (*see, Miller v State of New York,* 62 NY2d 506, 510; *De Long v County of Erie,* 60 NY2d 296; *Garrett v Holiday Inns,* 58 NY2d 253; *Yearwood v Town of Brighton,* 101 AD2d 498, 501-502, *affd* 64 NY2d 667). Nor may claimants recover on a theory that the college is in loco parentis to its students and is obliged to protect them from the dangerous activities of other students. That theory has been almost universally discounted in other jurisdictions on the rationale that the college's relationship with its students is not such as to give rise to a legal duty of protection (*see, Bradshaw v Rawlings,* 612 F2d 135, *cert denied sub nom. Borough of Doylestown v Bradshaw,* 446 US 909; *Baldwin v Zoradi,* 123 Cal App 3d 275, 282-285, 176 Cal Rptr 809, 813-815; *Tort Liability of Public Schools and Institutions of Higher Learning for Injuries Caused By Acts of Fellow Students,* Ann., 36 ALR3d 330).

The relationship between the administrators of a college and its students is dramatically different from what it once was. At one time a college exercised substantial control over student conduct in return for which the student acquired certain rights of protection from the college. The groundswell of demands for recognition of students' rights which occurred in the late sixties made the students' disenchantment with that role only too clear. They demanded and received expanded rights and greater freedom in connection with their college life, as a result of which the college is no longer able to regulate student activities with the kind of strictures which one prevailed (*see, Bradshaw v Rawlings,* 612 F2d 135, 138-140, *supra*).

That is not to say that a college is absolved of all responsibility for the safety of its students. Students enroll in a college in the expectation that, not only will they be afforded the means to derive an education in an atmosphere conducive to the stimulation of thought and learning, but also that they will be permitted to do so in an environment reasonably free from risk of harm. A college is not expected to be a guarantor or insurer of

the safety of its students, but obviously is expected to provide, in addition to an intellectual climate, a physical environment harmonious with the purposes of an institution of higher learning. To that end it employs a security force and establishes rules and regulations, breach of which can lead to suspension or expulsion.

■ Although there is generally no duty on the part of a college to screen applicants with an eye toward rejecting potentially dangerous individuals, a different situation is presented when the institution embarks on an experimental program for the admission of convicted felons. We agree with the trial court that college officials were negligent in admitting Campbell without any attempt to determine the nature of the risk he might present. Moreover, the college breached both a statutory and an assumed duty to its students in administering the SEEK program without adequate study, safeguards or inquiry, thereby creating an unreasonable risk of harm to the college community, including Rhona Eiseman (*see, Weiss v Fote,* 7 NY2d 579, 589; 2C Warren, New York Negligence, Municipal Corporations § 5.02, at 408-409 [3d ed]; *cf. Southworth v State of New York,* 62 AD2d 731, *affd* 47 NY2d 874).

The SEEK program was established pursuant to Education Law § 6452 and was designed to provide an educational opportunity for residents of the State who are "(1) graduates of an approved high school or [who have a high school equivalency diploma] * * * (2) who have potential for the successful completion of a post secondary program, and (3) are economically and educationally disadvantaged" (Education Law § 6452 [1]). The statute further provides:

"2. Such universities shall each formulate a general plan for the organization, development, co-ordination and operation of such a program within the amounts made available therefor by law. Such a plan shall include:

"a. Definition of eligibility * * *

"b. Procedures for the selection of students from among the eligibles".

Regulations promulgated under the statute provide that a plan for organization and operation of the program shall be submitted to the Board of Regents and that it shall include "(b) the criteria for student eligibility for inclusion in the institution's opportunity program" (8 NYCRR 27-2.1). Thus, both the statute and the regulations make clear, and the legislative history bears out, that it was the intent of the Legislature that institutions

voluntarily adopting this program would be required to formulate criteria for admissions personnel to utilize in selecting students who, by virtue of their backgrounds and abilities, would have the greatest likelihood of successful matriculation. Implicit in the requirement that colleges formulate specific criteria for admission is the understanding that they will adhere to them in selecting from the vast number of financially disadvantaged applicants those students who would be most likely to benefit from the substantial financial resources of the program, including free tuition, room and board and a financial stipend.

It is unclear from the record whether the college ever developed a plan. If a plan and procedures were developed as part of the college's application for funds, they were not made known to the administrators of the program and were not followed with respect to Campbell's admission. Michael Pirowskin, Director of Admissions for SEEK, testified that the only factors he considered in admitting Campbell were those factors in the statute, i.e., residency in New York State, the equivalent of a high school diploma, income under a certain level and an indication of a potential to succeed. He testified that he knew Campbell was a New York resident and within the income limits because he was an inmate and thus a ward of the State. With respect to his potential, Pirowskin stated that he took into consideration the fact that Campbell had taken some courses while he was at Fishkill. He did not know whether he had completed those courses successfully, did not know his I.Q. and obtained no psychological data, opining that such information was not required. He stated that he knew Campbell was in prison at the time of his admission, but did not know on what charges he was incarcerated and made no inquiry as to what they were. It was apparent from Pirowskin's testimony that he believed a person had to be admitted if the four statutory requirements were met and that he had not followed any plan or established any criteria to determine Campbell's eligibility or to evaluate the risk which he presented:

"Q. Now, at the time when you admitted Larry Campbell, you knew, obviously, by virtue of the fact that he was corresponding with you from prison that he had had some sort of prison record?

"A. Correct.

"Q. Did you know what the charges were which occasioned Larry Campbell's incarceration?

"A. No, I didn't.

"Q. Did you know, sir, that he pled guilty to and received an indeterminate sentence of up to eight years for two counts of

possession of dangerous drugs and that the plea encompassed another indictment charging attempted murder * * *[1]

"A. No, sir * * *

"Q. You made no inquiry whatsoever as to your having a felon introduced into the school and you made no inquiry as to what the felonies were?

"A. No, sir.

"Q. Did you know, sir, about the length of these criminal records?

"A. No.

"Q. I take it then you did not know that he was arrested approximately fifteen times * * *[2]

"A. I don't know about the extensive — I'm not in the criminal system. I don't know the parole system and how they get to prison and the whole background.

"THE COURT: You made no inquiry either?

"THE WITNESS: The other side of this thing is as far as I understood is that we did not have a right or access to the records. I'm not saying that we would have * * *

"Q. Mr. Pirowskin, as Director of Admissions, did you have any discretion as to the admission of a student in the S.E.E.K. program?

"A. I don't understand the question * * *

"[Q.] Do you have the discretion and the authority to make a judgment as to whether or not a student would present a threat to other students and be a menace in a campus setting?

"[A.] I don't see how I could have made that determination, based on the guidelines I was functioning under."

The college had no obligation to participate in the SEEK program. Having embarked upon it, however, it was statutorily required to develop criteria for eligibility. Once it decided to accept incarcerated felons, it concomitantly assumed a further duty to establish rational criteria for screening such applicants and to make such inquiry as would enable it to evaluate the risks such persons posed for the rest of the college community and to take measures to minimize those risks. The college thus assumed a legal duty to conduct the program in a nonnegligent

1. According to the record, Campbell was serving an indeterminate sentence with a maximum of six years on a reduced plea to criminal possession of a dangerous drug in the fourth degree.

2. The record indicates Campbell was arrested approximately 25 times.

manner (*see, Florence v Goldberg,* 44 NY2d 189; *Moch Co. v Rensselaer Water Co.,* 247 NY 160) and to employ that degree of care and foresight commensurate with the reasonable probability of harm (*see, McCrink v City of New York,* 296 NY 99, 106; *Cooper v State of New York,* 89 AD2d 811). The scope of the college's duty herein is the well-known *Palsgraf* formulation that "[t]he risk reasonably to be perceived defines the duty to be obeyed" (*Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344; *see, Rieser v District of Columbia,* 563 F2d 462). Instead, the program was adopted without adequate study, without establishing a rational basis for selecting those persons with the greatest potential to succeed and without inquiring into the backgrounds of the applicants. Obviously, if rational criteria had been established, a person with a history of violent psychotic episodes, drug abuse and felonious assaults would not have been eligible. Moreover, once alerted to the fact of Campbell's incarceration, suicide attempt and problems within the correctional system, a reasonable inquiry of prison officials would have revealed Campbell's criminal and psychiatric history, and his propensity for violence. Provided with that knowledge, it is inconceivable that the college would have admitted Campbell.

The State argues that a finding of negligence on the part of the college would require it to do an extensive background search of each of its 3,000 students before admission. That argument, of course, misses the point. Our analysis does not focus on the general college population but only on those persons admitted from penal institutions, numbering only 10 at the time Campbell was admitted. The requirement of evaluating and screening those 10 people when balanced against the risk to be avoided is inconsequential.

The scope of the duty assumed by the college, as defined by the foreseeable risk, extends only to those in the college community who were within the "zone of danger" which the college created. That duty, however, does not extend to the general population and thus the State may not be held liable for the injuries sustained by Michael Schostick. The risk which Campbell's admission to the college presented for Eiseman was essentially different from that created for Schostick. Campbell's admission gave rise to an inference by fellow students that he was just another student who, as the trial court found, shared their "goal of experiencing the academic and social benefits of the college". It was, therefore, predictable that as part of the social interaction within the college, fellow students would befriend Campbell and invite him into their homes and apartments. It was also foreseeable that fellow students, viewing Campbell as their

peer, would neglect to take precautions which might in other circumstances have prevented them from associating with someone of Campbell's background.

■ It is argued that the State cannot be held liable for the intervening acts of Campbell which proximately caused Eiseman's death. Although Campbell's intervening criminal act was the immediate cause of the tragedy, the State may not be relieved of liability for the reason that the intervening act was a foreseeable consequence of the risk created by the college's negligence in admitting a violent mentally disturbed felon (*see, Miller v State of New York,* 62 NY2d 506, 514, *supra; Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315, *supra; Parvi v City of Kingston,* 41 NY2d 553, 560; *Bell v New York City Health & Hosps. Corp.,* 90 AD2d 270, 285; Restatement [Second] of Torts §§ 443, 449; Prosser and Keeton, Torts § 44 [5th ed]).

CAMPBELL'S RELEASE FROM PRISON

Claimants assert that the State should be held liable for Campbell's conditional release from prison, for the failure to impose "special conditions" on his release, for the Board of Parole's failure to supervise Campbell properly after his release and for its failure to revoke Campbell's conditional release in light of evidence that he had reverted to drug and alcohol abuse, and possibly to criminal behavior. The trial court correctly found that Campbell's release was statutorily mandated (Penal Law § 70.40 [1] [b]; Correction Law §§ 803, 805)[3] and that the Department of Correctional Services was without authority to deny Campbell's request for conditional release (*Kriese v State of New York,* Ct Cl, Claim No. 61020, June 29, 1981, Moriarty, J., *affd* 89 AD2d 824).

■ The remaining allegations against officials of the Department of Correctional Services and the Board of Parole are that they should have imposed additional or different conditions upon Campbell's release, that he should have been supervised more closely, and that his parole should have been revoked. The trial court found and the record bears out that various restrictions were placed on Campbell's conduct while on conditional release and that he was supervised rather stringently. The acts

---

3. Correction Law § 805 has since been renumbered section 212 (L 1970, ch 476, § 43) and repealed (L 1977, ch 904, § 2), as part of a recodification of provisions governing parole release and supervision which transferred provisions previously found in the Correction Law to the Executive Law (*see,* Executive Law art 12-B). For the purposes of this appeal we adopted the sections which were in effect at the time of Campbell's release.

of the corrections officials and the parole supervisors in monitoring Campbell's release involved the kinds of policy determinations which are of a discretionary or quasi-judicial nature and therefore insulated from liability (*see generally, Immunity of Public Officer from Liability for Injuries Caused by Negligently Released Individual,* Ann., 5 ALR4th 773). "The immunity of public officers for the exercise of their discretionary power is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability" (*Santangelo v State of New York,* 101 AD2d 20, 25; *see, Tango v Tulevech,* 61 NY2d 34, 40-41). Even if the actions of these officials are not entitled to absolute immunity (*see, Williams v State of New York,* 308 NY 548; *Brownshield v State of New York,* 76 AD2d 849; *Welch v State of New York,* 74 AD2d 661; *Taylor v State of New York,* 36 AD2d 878), the record establishes that the actions of the officials in imposing conditions on and supervising Campbell had a rational basis, were nonnegligent and involved a judgment call as to the most appropriate method of supervision. We therefore conclude that the Department of Correctional Services and the parole officers acted reasonably in the exercise of their judgment and that no liability attaches to their actions (*see generally,* Comment, *Governmental Immunity and the Release of Dangerous Inmates from State Institutions: Can the State Get Away With Murder?,* 33 Buffalo L Rev 491).

Accordingly, the judgments should be affirmed.

CALLAHAN, O'DONNELL and PINE, JJ., concur with DENMAN, J.; HANCOCK, JR., J. P., concurs in result and in all of the majority opinion except that pertaining to negligence of the college and as to that, concurs with the affirmance essentially for reasons stated in the decision at Court of Claims.

Appeal No. 1 — Judgment affirmed, with costs.

Appeal No. 2 — Judgment unanimously affirmed, without costs.