*180 OPINION OF THE COURT
Kaye, J.
This appeal from a negligence award focuses on the duty of the State, when an ex-felon with a history of drug abuse and criminal conduct, upon release from prison, is accepted into a special State college program for the disadvantaged, and thereafter rapes and murders a fellow student. We conclude that the State’s alleged negligence involved no breach of duty owed to decedent, and the award to her estate must therefore be overturned.
Facts
Charged in three indictments with attempted murder, attempted assault, robbery, larceny, and criminal possession of weapons and drugs, on June 29, 1972, Larry Campbell — then 30 years old — pleaded guilty to criminal possession of dangerous drugs in the fourth degree in satisfaction of all the charges, and received a maximum prison sentence of six years. Campbell remained incarcerated at various correctional facilities until he was conditionally released on December 19, 1975 — the statutorily mandated release date, calculated by applying both his "good behavior time” (see, Correction Law § 803, former § 805 [renum § 212 by L 1970, ch 476, § 43, now Executive Law art 12-B]; Penal Law § 70.30 [4]; § 70.40 [1] [b])[1] and his "jail time”, or time served awaiting trial (see, Penal Law § 70.30 [3]). Although a longtime heroin addict with a string of arrests, pleas and periods of incarceration for stealing and drug-related crimes beginning a decade or more earlier, this was Campbell’s first extended prison confinement.
During his incarceration Campbell was at various times *181 treated for mental disorders, and numerous psychiatric, psychological and parole evaluations were prepared. He was diagnosed as suffering from chronic schizophrenia, paranoid type, with a schizoid, impulsive/explosive personality, a high criminal potential, and a low rehabilitation potential; he was said to have a potential for killing, and was characterized as antisocial, temperamental, belligerent, unpredictable and disruptive, with a guarded prognosis. In his day-to-day prison life, Campbell apparently was comparatively well behaved. On a scale of 1 to 10 (1 being the best inmate), the Superintendent of the Auburn Correctional Facility — claimants’ witness —graded Campbell at 2V%. He described Campbell as annoyingly litigious, but observed that he had few disciplinary infractions, none of a "serious” nature, and that he had participated in prison programs and pursued educational opportunities. While at Clinton Correctional Facility, Campbell obtained a high school equivalency diploma, and while at Eastern Correctional Facility took college-level courses.[2]
Anticipating release, on January 20, 1975, Campbell applied for admission to the SEEK (Search for Education, Elevation and Knowledge) program at the State University College at Buffalo (the College), to begin September 1975. His application revealed his then residence at Albion Correctional Facility as well as prior incarceration elsewhere, and it was supported by several recommendations.
SEEK, created by the Legislature approximately 20 years ago, is part of a State-wide program conducted by public and private colleges and universities, to offer the opportunity for higher education to disadvantaged high school graduates (see, Education Law § 6451 et seq.; see also, Mem of Senator Earl W. Brydges, 1970 NY Legis Ann, at 168-170). The statutory criteria for acceptance into the SEEK program are economic and educational — a high school diploma or its equivalent; the potential for completing a postsecondary program; and economic and educational disadvantage (Education Law § 6451 [1]). The SEEK director at the College testified that applications there were evaluated solely on these three statutory criteria, and not on an applicant’s prior criminal record or prior psychological history. Those admitted to the program *182 were furnished tuition, room and board, and a stipend. Additionally, the statute provided for remedial courses and academic counseling.
As part of the acceptance package, the College sent Campbell a printed form entitled "Health Report and Physician’s Certificate”, a portion of it for completion by the prospective student and a portion by an examining physician. The purpose of this form was undisputedly to enable the College to offer follow-up care for its student, not as an admissions criterion. John P. Fernandez, a doctor at the Albion Correctional Facility, on May 12, 1975, completed the "Physical Examination” portion of the form. In response to the question, "Is there any evidence of any anxiety or other tension states or emotional instability?”, Dr. Fernandez wrote, "No”. In the portion of the form for the prospective student, the question, "Have you ever been under the care of a psychiatrist?”, was left unanswered. Campbell’s completed health report nowhere disclosed that he had been a heroin addict, or that he had a history of mental disorders, including several suicide attempts.
On July 22, 1975, Campbell left his temporary release job outside the prison, made an unauthorized trip into Buffalo, and was disciplined by the loss of "good time” and transfer from Albion (a low security facility) to Auburn Correctional Facility. While awaiting transfer, and after parole and early release had been denied, Campbell attempted suicide. He was sent to Fishkill Correctional Facility, from which he was admitted to Matteawan State Hospital for examination and treatment, and thereafter discharged back to the general prison population. From Fishkill, Campbell wrote to his SEEK counselor at the College, telling him of the suicide attempt and of his problems in prison. Campbell’s request for a leave of absence was granted by the College, and he was advised that he would be expected for the spring semester.
On December 19, 1975 Campbell was conditionally released from prison. There is no indication that at the time of his release Campbell was addicted to drugs or in need of any treatment; no psychiatric treatment or medication was specified, and no special conditions were added to the printed "Conditions of Parole”, which included supervision by a parole officer. During the spring semester, Campbell lived on campus and attended classes, and — despite an incident when he was visiting his mother in New York City during April 1976 — was seemingly making a satisfactory adjustment at the College. *183 His parole officer, testifying for claimants, said he regarded Campbell as a "high risk” case, and therefore placed him under "intensive supervision,” meaning that he advised the SEEK liaison about Campbell, required biweekly visits and a curfew, worked closely with campus security, who the parole officer told to "let [him] know if Campbell sneezes”, and checked on him during on-campus visits one or more times a week. During the spring semester Campbell arranged to continue attending classes for the summer and to live with the son of his SEEK counselor, a fellow student.
At the College, Campbell befriended Rhona Eiseman, Thomas Tunney, Teresa Beynard — all fellow students — and Michael Schostick, a nonstudent. Eiseman, Tunney, Beynard and Schostick shared an off-campus apartment. On June 9, 1976, at the apartment, Campbell murdered Tunney, raped and murdered Eiseman, and inflicted serious injuries on Schostick. Eiseman’s estate and Schostick commenced suit claiming negligence on the part of the State in its release of Campbell, in failing to advise the College of his medical history, in admitting him to the College without appropriate inquiry, and in failing adequately to supervise him. The Court of Claims after trial dismissed Schostick’s claim, on the ground that neither a duty of care nor a chain of causation linked the State to his injuries, but it held the State liable for Eiseman’s death on two of the several theories propounded by claimants: that the State was negligent when its agent, the prison physician, failed to inform the College and its students of Campbell’s medical history, and that the College was negligent in admitting him or failing to restrict his activity in accordance with the risk he presented, both of which were a proximate cause of injury. The Appellate Division affirmed. This court denied Schostick’s motion for leave to appeal and, following a trial to assess damages, granted the State’s motion. We now reverse the award and dismiss the claim.
Discussion
At the outset, it is helpful in narrowing the discussion to summarize certain matters resolved below relating to Campbell’s release from prison and supervision while at liberty.
Although claimants initially cited Campbell’s release as an act of negligence by the State, in fact his release from prison was required by law and was not an act upon which the State could be found negligent. As the Appellate Division noted, *184 "The trial court correctly found that Campbell’s release was statutorily mandated (Penal Law § 70.40 [1] [b]; Correction Law §§ 803, 805) and that the Department of Correctional Services was without authority to deny Campbell’s request for conditional release”. (109 AD2d 46, 57.) Indeed, claimants no longer dispute that Campbell was entitled to release on December 19, 1975.
Similarly determined against claimants by the trial court, and affirmed by the Appellate Division, are assertions that the State was negligent in failing to impose additional restrictions on Campbell’s release, or supervise him more closely, or revoke his release and return him to prison after evidences of violation of the conditions during April 1976. Setting the conditions of release was properly recognized as a discretionary function within the State’s absolute immunity, foreclosed from judicial review (see, Tarter v State of New York, 68 NY2d 511). "The acts of the corrections officials and parole supervisors in monitoring Campbell’s release involved the kinds of policy determinations which are of a discretionary or quasi-judicial nature and therefore insulated from liability”. (109 AD2d, at 57-58.) Moreover, as held below, even if immunity were for some reason inapplicable, the official actions in supervising Campbell and continuing his liberty had a rational basis and were nonnegligent; both lower courts were satisfied from the factual record that the State had acted reasonably in monitoring Campbell arid allowing him to remain at liberty. Indeed, both courts observed that supervision of Campbell went beyond "reasonable”: the trial court concluded that "even with benefit of hindsight there is no basis for a finding that [Campbell’s parole officer] should have performed other than he did”, and the Appellate Division observed "that he was supervised rather stringently.” (109 AD2d, at 57.) These affirmed factual findings have support in the record and are therefore beyond the scope of our review (Humphrey v State of New York, 60 NY2d 742, 743-744).
Claimants’ assertions of negligence with respect to Campbell’s release and supervision are now concentrated on one point: that Campbell’s parole officer violated a statutory duty to revoke his conditional release as a result of the April 1976 New York City incident, and that this failure constituted negligence as a matter of law. In the factual circumstances found below, however, we agree with the conclusion of the lower courts that no statutory or regulatory duty was violated, and that the judgments made — if not shielded by absolute *185 immunity (see, Tarter v State of New York, 68 NY2d 511, supra) — were nonnegligent.
Thus, what remains for determination is whether the State should be held answerable civilly in damages to the estate of decedent for the vicious acts of an ex-convict, while lawfully at liberty, (1) because of the prison physician’s response to the health report, or (2) because of Campbell’s enrollment at the College. We conclude that neither is a basis for liability, and do not reach the issue of causation.
Liability for Acts or Omissions of the Prison Physician
Both lower courts concluded that the prison physician inaccurately completed Campbell’s health report — that in indicating there was no evidence of emotional instability he necessarily failed to examine Campbell’s medical records and misled the College regarding Campbell’s stability. With no citation of authority they held that the physician had thus breached a duty that ran to students of the College individually. In the judgment of the Appellate Division, if Campbell’s medical history had been disclosed in the medical report, there could be little doubt that the College would have rejected him.
The human desire that there should be some recovery for this tragedy is understandable, as is the commonsense expectation that a health report would solicit a responsible medical history that would reveal prior instability and addiction. But before proceeding into the uncharted waters of the legal consequences of a physician’s inaccurate responses to a health report — particularly the novel question whether his duty ran beyond the school, to students individually — it is necessary to consider whether there is any support in the record for the holding that by his responses the physician actually committed wrongdoing and misled the College.
Any finding of wrongdoing in the completion of the form must of course begin with scrutiny of the completed form upon which this holding hinges. Both courts specifically identified as wrongful the physician’s negative response to the question, "Is there any evidence of anxiety or other tension states or emotional instability?” The trial court additionally referred to his failure to describe Campbell’s medical history under "Personal History”, and to respond to the question regarding prior psychiatric care. Dr. Fernandez was not him *186 self called to testify by either party. There is, moreover, no suggestion that he withheld information personally known to him from any prior relationship with Campbell, or indeed that he had any prior relationship with Campbell; liability was predicated on the conclusion that the report imposed an affirmative duty on the prison physician to investigate Campbell’s medical records.
The form was part of Campbell’s postadmission acceptance package. The first page, including the "Personal History”, asked "Have you ever been under the care of a Psychiatrist?” and "Do you have any drug, food or other allergies?” (emphasis added), obviously contemplating that responses would be made by the prospective student, not the physician. The second page, captioned "Physical Examination,” was principally devoted to physical findings upon an examination, such as the condition of the patient’s eyes, ears, glands, heart and lungs. It then asked, "Is this individual capable of unlimited physical activity (athletics, gym classes, swim?)”; "Is there any evidence of anxiety or other tension states or emotional instability?” (which, on the single line provided, the doctor answered "No”); "Do you recommend further investigation or treatment?” (left blank); and "If you wish any medical treatment carried out while the student is at College, please send separate detailed instructions to the College physician.” The page concluded with the date, signature, address and telephone number of the "Examining Physician,” and the following legend: "Examining Physician: Please detach along perforation and return this form to: Medical Director, State University College at Buffalo, 1300 Elmwood Avenue, Buffalo, New York 14222.”
Wholly apart from its plain and undisputed intendment, this particular form on its face asked the doctor for a report of a physical examination, not a certified medical history; it did not call upon the physician to search and convey the contents of the prison medical records. While the State asserts that such an inquiry would have impermissibly sought confidential information, citing Mental Hygiene Law § 33.13, the fact remains that this form did not even request such information. Thus, there is no support for the predicate conclusions that the physician responded inaccurately, that he had a duty in completing this form to investigate Campbell’s prison records, and that he misled the College.
Even assuming, however, that the physician’s response *187 was incomplete or inaccurate by reason of his failure to set forth Campbell’s prior medical history, we disagree with the lower courts that the doctor’s duty extended to all students of the College individually.
Embedded in the law of this State is the proposition that a duty of reasonable care owed by the tort-feasor to the plaintiff is elemental to any recovery in negligence (see, e.g., Pulka v Edelman, 40 NY2d 781, 782; Palsgraf v Long Is. R. R. Co., 248 NY 339, 344). Foreseeability of injury does not determine the existence of duty (Strauss v Belle Realty Co., 65 NY2d 399, 402). Unlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis by the fact finder, the duty owed by one member of society to another is a legal issue for the courts (De Angelis v Lutheran Med. Center, 58 NY2d 1053, 1055). "While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that 'the legal consequences of wrongs [are limited] to a controllable degree’ ” (Waters v New York City Hous. Auth., 69 NY2d 225, 229, quoting Tobin v Grossman, 24 NY2d 609, 619; see also, Fazzolari v Portland School Dist. No. 1J, 303 Ore 1, 734 P2d 1326 [Linde, J.]). While the Appellate Division in a single sentence disposed of the issue ("Fernandez was under a duty to respond accurately to the questionnaire, a duty which extended to the college community” [109 AD2d, at 51]), we cannot agree that the physician completing a prospective college student’s report of a physical examination owed a duty to each member of the college community to search out and disclose a patient’s medical past.
Liability in negligence may of course rest on some form of written misrepresentation or nondisclosure on the part of defendant by which plaintiff or a third party is misled, resulting in injury or damage to plaintiff. The basis of liability is the fact that the misrepresentation or nondisclosure has led the person to whom it was made to forego action that might otherwise have been taken for the protection of the plaintiff (Prosser and Keeton, Torts § 33, at 207 [5th ed]). "Liability in such cases arises only where there is a duty * * * to give the correct information * * * There must be knowledge or its equivalent that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that if false or erroneous he will because of it be injured in person or property. Finally, the relationship of the parties *188 * * * must be such that * * * the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care.” (International Prods. Co. v Erie R. R. Co., 244 NY 331, 338.) Applying these standards in commercial actions for the negligent preparation of financial reports, we have further required actual privity, or something approaching privity, such as conduct on the part of defendant linking defendant to plaintiff which evinces defendant’s understanding of plaintiff’s reliance (Credit Alliance Corp. v Andersen & Co., 65 NY2d 536, 550; see also, White v Guarente, 43 NY2d 356, 361; Ultramares Corp. v Touche, 255 NY 170, 182-185; Glanzer v Shepard, 233 NY 236, 238-239). We have limited the universe of permissible plaintiffs because a failure to do so would impose a duty of reasonable care enforceable by any member of an indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured by any negligence. "The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.” (Ultramares Corp. v Touche, 255 NY 170, 179-180, supra.)
While hardly identical, the situation before us poses a similar underlying concern: that the physician reporting the results of a physical examination of a patient, for the benefit of his patient, not be held to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act. In completing this particular report, the physician plainly owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient. The physician did not, however, undertake a duty to the community at large (see, White v Guarente, 43 NY2d 356, 361, supra; Palsgraf v Long Is. R. R. Co., 248 NY 339, 342, supra; see also, Knier v Albany Med. Center Hosp., 131 Misc 2d 414, 415). There is no evidence that Dr. Fernandez was aware or should have been aware that this form would be relied on by decedent or other students as his representation of Campbell’s medical history. Indeed, there is no indication that anyone other than Campbell and the College medical director was intended to receive the information or could have been expected to rely on it. Any duty the physician might have had to inform the College of Campbell’s medical history, in connection with offering him health care, thus did not extend to members of the College community individually (see, Strauss v Belle Realty Co., 65 NY2d 399, 403- *189 404, supra; Moch Co. v Rensselaer Water Co., 247 NY 160, 168).
We therefore conclude that liability was erroneously imposed on the State for. the conduct of the prison physician in completing Campbell’s health report.
Liability for Acts or Omissions of the College
Independent of the physician’s conduct, the courts below also found the College liable to claimants.
The trial court, while acknowledging the limited scope of judicial review of college admissions decisions, concluded that liability should be predicated on the College’s failure to reject or restrict Campbell because of the unreasonable risk of harm and foreseeable danger he presented: "[the College’s] duty, simply put, was not to subject its students to an unreasonable risk of harm from the conduct of one such as Campbell whom it knew or should have known posed such a risk. See 2 Restatement (Second) of Torts, § 302B, supra. ” The Appellate Division found a breach of statutory duty to develop criteria for eligibility, concluding that if rational criteria had been established Campbell would not have been admitted. The Appellate Division, moreover, posited the College’s duty of heightened inquiry on the fact that this was "an experimental program for the admission of convicted felons” (109 AD2d, at 53, 55).
There is no basis for the conclusion first reached by the Appellate Division that the College breached a statutory duty when it accepted Campbell by simply applying the statutory standards, and without having formulated regulations establishing additional criteria for eligibility. We thus need not consider whether any duty to enact regulations, if it existed, would operate to permit recovery for damages for injury by one student to another.
Nor can we accept the conclusion below that, by participating in this special program, the College undertook either a duty of heightened inquiry in admissions, or a duty to restrict his activity on campus, for the protection of other students.
As noted earlier, the imposition of duty presents a question of law for the courts (see, Akins v Glens Falls City School Dist., 53 NY2d 325, 333; Pulka v Edelman, 40 NY2d 781, 782-784, supra), resting on policy considerations of whether plain *190 tiff’s interests are entitled to legal protection against defendant’s conduct (Turcotte v Fell, 68 NY2d 432, 437; De Angelis v Lutheran Med. Center, 58 NY2d 1053, 1055, supra; see generally, Prosser and Keeton, Torts § 53 [5th ed]). While both lower courts soundly disavowed the imposition of liability on the basis of the doctrine of in loco parentis — concluding that colleges today in general have no legal duty to shield their students from the dangerous activity of other students (see, 109 AD2d, at 52-53; see also, Reidhaar, The Assault on the Citadel: Reflections on a Quarter Century of Change in the Relationships Between the Student and the University, 12 J Coll & Univ L Rev 343) — the question before us today, in essence, is whether such a duty should nonetheless be recognized when a college admits an ex-felon such as Campbell as part of a special program. As claimants recognize, we have not previously imposed such a duty, and we see no justification for doing so now.[3]
SEEK is an established program for the disadvantaged generally, which may include persons who have completed prison terms — and thus by definition persons with a history of antisocial, even dangerous behavior — but it does not include incarcerated felons. When he began his studies at the College, Campbell was not an incarcerated felon; he had served his prescribed punishment and was entitled to release, on conditions that did not include any continuing care or treatment. The SEEK admissions director at the College determined that —apart from his educational and economic qualifications — he had the "potential for the successful completion of a post secondary program”. (Education Law § 6452 [1].) Consistent with his parole obligations, theoretically Campbell could have lived anywhere he chose, and otherwise enjoyed the rights of other citizens, including the right to be free of unfair discrimination by reason of prior arrests and imprisonment (see, e.g., Correction Law art 23-A [employment of former inmates]; Executive Law § 296 [15], [16]). His release and return to *191 society at the age of 33 — presumably with a long life still ahead of him — were mandated by law as well as by public policy, which have as their objectives rehabilitating and reintegrating former inmates in the hope that they will spend their future years productively instead of returning to crime. To this end, the value of education — both as an escape from society’s underclass, and as a benefit to the public generally— is apparent (see, Correction Law § 136; 1969 McKinney’s Session Laws of NY, at 2579).
These policy considerations are pertinent to our determination that, as a matter of law, a heightened duty of inquiry should not have been imposed on the College. Such a duty would run counter to the legislative policy embodied by the SEEK program as well as the laws and policies promoting the reintegration of former convicts into society. But even more fundamentally, the underlying premise that, once released, Campbell by reason of his past presumptively posed a continuing, foreseeable risk of harm to the community is at odds with the laws and public policy regarding the release of prisoners. Consistent with conditions of parole, an individual returned to freedom can frequent places of public accommodation, secure employment, and if qualified become a student. On any other theory, former inmates cannot be returned to society without imposing on those who open doors to them the risk of absolute liability for their acts.
Nor did the College have a duty to restrict Campbell, as a student, even assuming it had a right to control his contacts with other students. Publicly branding him on campus as a former convict and former drug addict would have run up against the same laws and policies that prevented discriminating against him. Moreover, the fact that Campbell had a criminal record was apparently known on campus, even to Eiseman and Schostick. In actual fact, Campbell was diligently monitored, as both lower courts found; until his brutal explosion, there was no complaint regarding his campus behavior. No greater restriction is even suggested that might have avoided this off-campus tragedy. As the college and university amici cogently contend, imposing liability on the College for failing to screen out or detect potential danger signals in Campbell would hold the college to a higher duty than society’s experts in making such predictions — the correction and parole officers, who in the present case have been found to have acted without negligence.
*192 Finally, it is apparent that there are profound social issues underlying this case. It therefore bears emphasis that the question before us for resolution is simply whether the College had a legal duty in the circumstances, that requires it to respond in damages for Campbell’s rape and murder of a fellow student; we do not consider whether a college might or even should investigate and supervise its students differently. Moreover, while hindsight has a peculiar clarity and wisdom, the fact remains that the contemporaneous, nonreviewable judgments by which the College’s actions must be evaluated were that Campbell, upon his release, needed no psychiatric care or other treatment, and further that he had a potential for success in college.
Accordingly, the judgment appealed from and order of the Appellate Division brought up for review should be reversed, with costs, and the claim dismissed.
Chief Judge Wachtler and Judges Simons, Alexander, Titoné and Bellacosa concur; Judge Hancock, Jr., taking no part.
Judgment appealed from and order of the Appellate Division brought up for review reversed, etc.

. Penal Law § 70.40 (1) (b) in relevant part provides: "A person who is serving one or more than one indeterminate sentence of imprisonment shall, if he so requests, be conditionally released from the institution in which he is confined when the total good behavior time allowed to him, pursuant to the provisions of the correction law, is equal to the unserved portion of his maximum or aggregate maximum term.” Conditions upon conditional release are substantially the same as conditions imposed upon parole. Campbell requested conditional release, signed a form agreeing to "Conditions of Parole,” and was thus entitled to be released into the legal custody of the Board of Parole, with a maximum expiration date of December 19, 1977 for parole supervision.

. There was substantial trial testimony reflecting the hard reality that inmates with long records of crime, schizophrenic behavior and drug abuse are, upon completion of their sentences, every day released into society, many only to be returned to prison and addiction. Campbell compared favorably to most other inmates, based on his apparent progress in prison.

. Claimants urge that, as authority, we might premise liability on the Restatement (Second) of Torts § 302 B — that the College was liable because it had a duty not to subject its students to an unreasonable risk of harm from one whom it knew or should have known posed such a risk. As is made clear in the Restatement, however, this section presupposes the existence of a duty (see, Restatement [Second] of Torts § 302 B, comment a; § 302, comment a), and thus cannot supply the fundamental omission here. Similarly inapposite are cases where there is a special relationship with a student, and cases imposing liability for failure to maintain school premises (see, e.g., Miller v State of New York, 62 NY2d 506).