OPINION OF THE COURT
Dennis K. McDermott, J.
The issue presented is whether a parent may recover money damages from his former spouse for the negligent infliction of emotional distress allegedly caused by the defendant’s bad parenting of their child. For the reasons that follow, the court finds that the plaintiff has failed to state a cause of action for such a recovery and that his complaint must be dismissed.
Plaintiff is a practicing attorney and the defendant is his former wife. The parties were divorced in 2004 and their divorce judgment provides that they would have joint custody of their two sons, one born in 1991 and the other in 1993, with primary physical custody placed with the defendant. The parties have been involved in family court litigation numerous times since their divorce, principally over issues of child support and alleged family offenses.
The instant litigation commenced on November 14, 2011. In his 262-paragraph complaint, plaintiff alleges nine causes of action for the negligent infliction of emotional distress, all involving the parties’ older son and premised on his assertion that joint custody imposes a duty that each parent owes to the other to cooperate in raising their child. Plaintiff claims that the defendant has breached that duty in various ways resulting in what he characterizes as “a series of disasters” to the son which have been the proximate cause of the assorted injuries that he claims to have suffered and for which he now seeks redress.
Plaintiff alleges that in 2005, the year following the parties’ divorce, the older son left the defendant’s home and came to live with him. In 2006, plaintiff and the son moved to Florida where the son’s musical talent gained him admission to a prestigious high school for the performing arts. Once he began attending the school, a downturn in plaintiffs career forced him to have to cut back on his expenses and move to an apartment in a less attractive neighborhood which caused the son to *759 become unhappy. Seizing upon this opportunity, defendant allegedly exploited the son’s dissatisfaction and persuaded him to withdraw from the school and move back with her in New York. Too ashamed to tell his father that he intended to take his mother’s advice, the son spent the next three nights away from the father’s home, causing the father to have to search the city’s streets “teeming with drug addicts and derelicts.” Plaintiff asserts that the defendant’s failure to include him in her discussions with the son led the son to feel that he had something to hide from the plaintiff, thereby causing him to spend three nights avoiding his father by wandering the urban streets and thus placing his life at risk.
In the aftermath of that event, the plaintiff tried without success to have defendant return the son to him so that he could re-enroll him in the performing arts school, but the defendant ignored the plaintiff and refused to respond to his emails. The son experienced significant depression, dropped out of school in New York, was fired from various menial jobs, and began abusing illegal drugs. Following a botched suicide attempt, he was held in confinement for psychiatric care. This, plaintiff alleges, was the second “disaster” that placed the son’s life at risk.
Following his discharge from psychiatric hospitalization, the son returned to live with the defendant and her new husband. The relationship between the son and his stepfather was not good. Shortly after the son returned to the mother’s home, the stepfather tore down the artwork the son had hanging on his bedroom wall, calling it “degenerate hippie garbage,” and later, in mid-November 2008, the stepfather physically attacked the son. The son reported the incident to his father:
“[H]e literally picked me up by my collar and threw me into the kitchen. Then he grabbed me again and threw me so hard that I hit my head pretty bad on [the] oncoming wall. He slapped me across the face, and grabbed my neck and slammed my head again and again against the cupboard door. I was terrified. I thought he was going to kill me. ... I was huddling on the floor crying because I was so scared.”
Plaintiff alleges that the defendant was present at these incidents but did nothing to intervene or even express her disapproval to her husband.
By this time, the plaintiff had moved from Florida to Kiev, Ukraine, where he was working. He claims that without any forewarning or other communication from the defendant, the *760 son suddenly appeared at a hotel in Kiev. The defendant, plaintiff alleges, put the son on an airplane and sent him to rejoin his father without any notice to the plaintiff and without providing the son with the plaintiffs address, thereby causing the son to spend three days frantically searching Kiev for his father. This is the third instance in which plaintiff claims that the defendant placed their son’s life at risk.[1]
Plaintiff alleges that the defendant was well aware that, when he was a child, he had been beaten by his own father and would, therefore, be particularly sensitive to any such abuse of his own son. By tolerating the emotional and physical abuse of their son by her husband and by her failure to communicate with him concerning their son, plaintiff alleges that the defendant “negligently caused plaintiff to suffer severe emotional disturbances with residual physical manifestations” which included the exacerbation and aggravation of plaintiffs existing hypertension (of which defendant allegedly was also well aware), dyspnea, heart palpitations, symptoms of heart failure, shock, worry and fear, not only for their son’s safety but constant fear that he himself might suffer a heart attack.
Further, plaintiff alleges that in the midst of these events, the defendant was receiving monthly Social Security benefits as the son’s representative payee. Once the child began residing with the plaintiff, he demanded that the defendant resign that responsibility in favor of him and turn over to him all funds received. When she refused and began using the funds to “reimburse” herself for various expenses, plaintiff claims that this conversion of the son’s money added to his torment and resulting injuries.
In her answer, the defendant admits that the parties are divorced and were awarded the joint custody of their sons. All other allegations as contained in paragraphs 6 through 262 of the complaint are denied. Upset by what he considered to be a frivolous answer, the plaintiff contacted defendant’s attorney and told her that he would give her an opportunity to cure the error by serving an amended, more responsive, answer. When defendant’s attorney demurred, plaintiff brought this motion seeking sanctions. The defendant has cross-moved for a dismissal of the complaint and seeks sanctions against the plaintiff.
*761 Plaintiff argues that under an award of joint custody there is a duty, actionable in tort, imposed on each parent in favor of the other. Although given the opportunity to do so, plaintiff has cited no legal authority supporting that argument. Instead, plaintiff argues that Johnson v State of New York (37 NY2d 378 [1975]) and Eiseman v State of New York (70 NY2d 175 [1987]) would warrant the finding, apparently for the first time, that such a duty exists. In this court’s view, plaintiffs reliance on these cases as authority for his claim is misplaced.
In Johnson, a claimant was allowed to recover for her emotional damages resulting from being misinformed by a hospital that her mother had died. The Court found that there was an existing legal duty on the part of the hospital to accurately advise the claimant that her mother had died and that the hospital breached that duty by misidentifying one of its patients and incorrectly telling the claimant that the deceased patient was her mother.
In Eiseman, claimants’ claim was dismissed upon a determination that the State owed no duty to a college student who was raped and murdered by a fellow student to warn the victim and college officials that her assailant was a recently-released felon with a significant history of psychiatric disorders.
A parent’s obligation in raising a child is owed to the child, not to the other parent. “[C]hildren are entitled to the love, companionship, and concern of both parents. So, too, a joint award [of custody] affords the otherwise noncustodial parent psychological support which can be translated into a healthy environment for the child.” (Braiman v Braiman, 44 NY2d 584, 589 [1978] [emphasis added].) Thus, where joint custody is awarded, it is done for the purpose of enhancing each parent’s ability to promote his or her child’s best interests. Joint custody allows both parents to “work together in a cooperative fashion for the good of their children.” (Matter of Jemmott v Jemmott, 249 AD2d 838, 839 [3d Dept 1998] [emphasis added], lv denied 92 NY2d 809 [1998].) If one parent ceases to cooperate with the other, the aggrieved parent’s recourse is to seek a termination of joint custody and an award of sole custody to protect the best interests of the child. The non-offending parent does not become entitled to money damages for the breach because it is not to the parent that the duty is owed. None of the cases cited by plaintiff would warrant this court finding such a duty by extension of existing law.
*762 Even if the plaintiff were to be viewed as a “bystander” whose injuries resulted from the breach of the defendant’s duty owed to their son, his claim would have to be dismissed.[2] In 1984, the Court of Appeals ruled in Bovsun v Sanperi (61 NY2d 219 [1984]) that a plaintiff who witnessed a member of his or her immediate family suffer death or a serious physical injury caused by defendant’s negligence could recover for his or her own resulting emotional trauma provided that the plaintiff was, at the same time, threatened with physical injury by being actually present in the same “zone of danger” created by the defendant’s negligence. The Court recognized that its decision involved “a broadening of the duty concept but. . . not the creation of a duty to a plaintiff to whom the defendant is not already recognized as owing a duty to avoid bodily harm.” (Id. at 229 [emphasis added].) In other words, where a plaintiff and his or her family member are simultaneously present in the same zone of danger, a defendant whose negligence has resulted in the family member’s death or serious physical injury has breached a duty of care owed to both the plaintiff and the plaintiffs family member. Under such circumstances, the plaintiff has established a breach of that duty with respect to him or her by the defendant, and recovery for the plaintiffs emotional distress is permitted. (Id. at 230.) But the Court, in so holding, emphasized the limitation of its ruling:
“We are not suggesting that any trifling distress would be sufficient to support recovery of damages under the zone-of-danger rule. Rather, the emotional disturbance suffered must be serious and verifiable (see Restatement, Torts 2d § 436, subd [3], Comment g). Additionally, the compensable emotional distress must be tied, as a matter of proximate causation, to the observation of the serious injury or death of the family member and such injury or death must have been caused by the conduct of the defendant.” (Id. at 231-232.)
The limitation upon this right of recovery was the subject of Trombetta v Conkling (82 NY2d 549 [1993]) where the Court *763 ruled that a niece who was within the zone of danger created by defendant’s negligence could not recover for her emotional injuries resulting from witnessing her aunt’s death inasmuch as the aunt was not a member of the niece’s immediate family. Clearly, then, the Court is not inviting an expansive reading of its holding in Bovsun.
Where, as the result of the alleged negligence of an obstetrician, a child died two days after her birth, the claim of the child’s father for emotional injury was dismissed because, although present during his daughter’s delivery, he was never in danger of physical injury himself. (Saguid v Kingston Hosp., 213 AD2d 770 [3d Dept 1995], lv dismissed 87 NY2d 861 [1995], lv dismissed and denied 88 NY2d 868 [1996].)
Similarly, a father, whose son was brainwashed by members of the Unification Church (also known as the “Moonies”), suffered an emotional breakdown, returned to his parents’ home and ultimately took his own life, was denied relief under claims he asserted for his own emotional distress. Following Bovsun, the court held that the father did not allege that the defendant’s conduct resulted in serious physical injury or death to his son contemporaneously witnessed by him in his presence and that the defendant’s acts posed no risk of bodily harm to the father himself. (Meroni v Holy Spirit Assn. for Unification of World Christianity, 125 Misc 2d 1061 [1984], revd on other grounds 119 AD2d 200 [2d Dept 1986], appeal dismissed 69 NY2d 742 [1987].)
Here, assuming for purposes of this motion that all of the plaintiffs allegations are true (Barr v Wackman, 36 NY2d 371, 375 [1975]; Huntsman Chem. Corp. v Tri/Insul Co., 183 AD2d 1002 [3d Dept 1982]), there is no allegation that plaintiff was physically present within the same zone of danger occupied by his son at the time of defendant’s actions, nor is there any basis for the court to find that the son suffered any serious physical injury. Under the limitations of Bovsun, then, the complaint would have to be dismissed for failure to state a cause of action.
The complaint likewise fails to state a cause of action for the intentional infliction of emotional distress. That cause of action has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or a reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the resulting emotional injury; and (4) severe emotional distress. (Howell v New York Post Co., 81 NY2d 115 [1993].) While this court entertains no doubt that *764 it was upsetting and frustrating for plaintiff to be ignored by the defendant and to see his son suffering these setbacks in his life, these things do not even begin to approach the type of conduct necessary to support that cause of action, viz., conduct “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” (Murphy v American Home Prods. Corp., 58 NY2d 293, 303 [1983].)
Each of the parties further seeks to have the other sanctioned under 22 NYCRR 130-1.1, the plaintiff alleging that the defendant’s answer is patently frivolous in that it denies substantially all of the allegations in his complaint including allegations that could not be denied in good faith (e.g., that Russian and Ukrainian are commonly spoken in Ukraine), and the defendant arguing that not only is the plaintiffs claim frivolous but that it is vexatious as well.
A defendant is expected to interpose an answer to a complaint in good faith. A general denial is unusual but, under appropriate circumstances, acceptable. As a rule, the more detailed and specific the complaint, the more detailed and specific the answer would be expected to be. General denials, particularly in response to detailed complaints, are not favored but there is normally no serious consequence for the defendant apart from an award of costs (Doyle v Buturlinsky, 26 AD2d 717 [3d Dept 1966]; Rouse v Champion Home Bldrs. Co., 47 AD2d 584 [4th Dept 1975]). But, if the denials lend an aura of sham to the whole of the defendant’s posture, they may be found to go to the very heart of the case and result in summary judgment against the defendant. (Dahlstrom v Gemunder, 198 NY 449 [1910]; Siegel, NY Prac § 221 [4th ed 2005].)
A motion to dismiss a complaint for failure to state a cause of action may be made either before or after the answer has been served. (CPLR 3211 [e].) Thus, to place the question of the sufficiency of the plaintiffs cause of action before the court, defendant was not required to serve any answer at all. Moreover, plaintiff does not allege that defendant’s answer caused him to have to engage in any inordinate discovery or motion practice. In the absence of some showing of resulting prejudice, the court will deny plaintiffs request for sanctions. (CPLR 2001; Matter of Kobeck v Motor Veh. Acc. Indem. Corp., 16 Misc 3d 592 [2007].)
A different result obtains with respect to the defendant’s request. In addition to the frivolousness of plaintiffs claim, *765 which the court finds to be “completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law” (22 NYCRR 130-1.1 [c] [1]), it appears that the claim was brought for the purpose of harassing the defendant and causing her to incur legal expenses (22 NYCRR 130-1.1 [c] [2]).
In May 2011, there was a pending family offense proceeding in Family Court which had resulted in the issuance of a temporary order of protection in defendant’s favor against the plaintiff. It appears that there may also have been a child support proceeding either pending or in the planning stages. Plaintiff and the defendant’s attorney were discussing terms of a possible settlement, among them plaintiffs suggestion that the parties exchange general releases, a proposal which seems not to have been enthusiastically received by the defendant’s attorney, she having told the plaintiff that she could see “no value” in such an exchange.
Plaintiff then wrote to the defendant’s attorney on May 20, 20ll[3] and, after noting that the defendant had sued him six times in six years and that “she’s one of the most litigious people I’ve ever known,” the plaintiff claims that he had never sued the defendant, but
“that’s going to change in the fall when [the younger son] is no longer living with her. At that time, unless we can settle now, I intend to sue [defendant] and her husband for negligent infliction of mental distress and prima facie tort for all the emotional and physical damage she and her husband have caused me via their mistreatment of [the older son]. I’m confident I can defeat a motion to dismiss on the claims I have in mind which means, whether I ultimately win or lose, it’s going to cost [defendant] more thousands of dollars to defend herself. So perhaps you, or your client, can see some ‘value’ in avoiding this expense” (emphasis added).
Manifestly, the plaintiff had been contemplating this litigation for several months before it was commenced. He anticipated that a motion to dismiss might be made and, therefore, had reason to research and consider, objectively, whether his claims might have any merit under the law or whether some plausible argument might be made for the court to extend existing law to find the duty that he claims to exist. Weighing that, and with *766 the realization that he might lose a dismissal motion, he nevertheless made a calculated decision to proceed. As an attorney himself proceeding pro se, he would not incur any legal expenses other than filing fees and the like, but he announced in advance that he was willing to risk defeat for the satisfaction of having forced the defendant to incur significant legal expenses.
Sanctions are appropriate where, as here, a plaintiff advances a frivolous claim. (Yankee Lake Preserv. Assn., Inc. v Stein, 68 AD3d 1603 [3d Dept 2009], lv denied 15 NY3d 706 [2010]; Navin v Mosquera, 30 AD3d 883 [3d Dept 2006].) From plaintiffs own words it appears that this action was not brought in good faith but rather as an act of retribution and for the purpose of subjecting the defendant to harassment and needless expense, thereby providing additional cause for sanctions. (Cadlerock Joint Venture, L.P. v Sol Greenberg & Sons Intl., Inc., 94 AD3d 580 [1st Dept 2012]; First Deposit Natl. Bank v Van Alien, 277 AD2d 858 [3d Dept 2000].)
The defendant is awarded the costs and disbursements of this action, motion costs, and her reasonable attorney’s fees in an amount to be determined. Defense counsel shall submit to the court within the next 20 days (with a copy to plaintiff) her affidavit or affirmation setting forth a detailed statement of the time and services rendered by her herein together with a statement as to what payment(s), if any, she has received from her client or from any other source. (Ireland v GEICO Corp., 2 AD3d 917 [3d Dept 2003].) Plaintiff shall have 10 days in which to respond by affidavit or affirmation and the court will thereupon consider that issue on submission without further oral argument.
Now, therefore, on motion of the defendant, it is ordered that plaintiff’s motion be, and the same hereby is, denied in all respects; and it is further ordered that defendant’s motion seeking dismissal of the complaint for failure to state a cause of action (CPLR 3211 [a] [7]) be, and the same hereby is, granted; and it is further ordered that judgment be entered herein in favor of the defendant dismissing the complaint, awarding to the defendant motion costs and the costs and disbursements of this action and granting a money judgment in favor of the defendant against the plaintiff for her attorney’s fees herein in an amount to be hereafter determined by the court, and that defendant have execution thereon.

. At this point in his complaint, plaintiff alleges, “Ukraine is a dangerous country where the police are in league with the criminals. Not far from where [the son’s] plane landed in Kiev is a forest where the headless corpse of a dissident journalist murdered by the police had been found not long before [the son] arrived.” (HH 51-52.)

. Plaintiff emphatically rejects any characterization of him as a “bystander” and claims that his injuries are the result of defendant’s breach of her duty to him, not her duty owed to their son. Nevertheless, the court must consider whether the complaint would support any cause of action in plaintiff’s favor, the appropriate standard being whether plaintiff actually has a claim, not whether he has properly pleaded one. (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].)

. See exhibit C attached to defendant’s motion papers.