OPINION OF THE COURT
Walter J. Relihan, Jr., J.
*576 I. The Facts
The plaintiff, now 30, suffered serious burns on December 8, 1992. The injury was inflicted by a friend, a guest in the plaintiffs Geneva Street apartment, when a hair spray solution was set alight and sprayed upon him. The friend was arrested and charged with assault and reckless endangerment.
Plaintiff was diagnosed as retarded at an early age. When not living at home, he participated in a number of institutional assisted living arrangements over a period of many years. In August 1990 he was admitted to a facility operated by the defendant Housing Opportunities Management and Essential Services, Inc. (H.O.M.E.S.), a not-for-profit corporation which provides housing for persons with various psychiatric or developmental conditions. H.O.M.E.S. limits itself to housing services. Therapy and related services are provided by others.
Programs of this kind, authorized and encouraged by state law, are conceived and operated as cooperative efforts supported by state and local agencies and private groups such as H.O.M.E.S. (see Mental Hygiene Law art 41, particularly § 41.01 [“Declaration of purpose”]; 14 NYCRR part 586 [“Operation of Community Residences”]). Pursuant to this collaborative system, plaintiff was employed at Challenge Industries, engaged in training at BOCES, and counseled with psychiatric social workers at the County Department of Mental Health while living in H.O.M.E.S. facilities. These activities took plaintiff to a variety of locales in the City of Ithaca and beyond, on a daily basis, without supervision of any kind.
The H.O.M.E.S. “Community Living Housing” program provides group housing for those with a psychiatric diagnosis and this was the primary diagnosis assigned to plaintiff. In Tompkins County, H.O.M.E.S. operates two such units, called Evergreen and Malcolm House. Each is occupied by up to eight persons and staffed on a 24-hour basis. Plaintiff lived in these facilities from August 1990 to August 1992.
A second level of H.O.M.E.S. facilities described as the “apartment setting” is divided into two subcategories called supportive apartments and intensive supportive apartments. The former arrangement involves contact between the resident and a staff member one to three times a week. The intensive plan provides daily contact with a staff member. In both categories, the resident lives in a private apartment, not a group home. No H.O.M.E.S. staff member, or other professional caregiver, lives in the apartments. The resident is expected to move *577 freely in the community and to participate in all of the collaborative services described above. The plaintiff moved to an intensive supportive apartment on Hudson Avenue, in August 1992, and, subsequently, to a similar arrangement on Geneva Street.
The plaintiff was not confined at Malcolm House, or Evergreen, or the two “apartment setting” rooms on Hudson Street or Geneva Street, pursuant to court order or other constraint, and was free to leave any of these facilities at any time. Indeed, he was free to leave the H.O.M.E.S. program altogether (Mental Hygiene Law § 41.41 [“Rights of mentally retarded and developmentally disabled”]). The regulations of the Commissioner of the Office of Mental Health, promulgated under the authority of the statute, require that such community residences must be operated “to implement the principle of the least restrictive alternative.’ Thus, individuals must be served in a community residence which is least restrictive of the individual’s civil and human rights consistent with his or her need for services. This also means that as the person’s ability to live independently increases, he or she should change living accommodations, regardless of continuing need for treatment or rehabilitative services” (14 NYCRR 586.1 [b]). The regulations provide that, regardless of the nature or classification of the community housing provided, the purpose of the program must always include “a constant striving to enable residents to move to less restrictive living settings” (14 NYCRR 586.1 [e] [ID.
The June 1992 decision to permit plaintiff to move from Evergreen to an “apartment setting” on Hudson Street was reached after a consultation between the H.O.M.E.S. staff and a number of other therapists, instructors and counselors who were involved in the plaintiff’s program. The affidavit of the manager of Evergreen, Jyl Dowd, states that plaintiff, while at Evergreen, exhibited excellent daily living skills, which were far superior to many other residents, and that he was “out every day,” went to school at BOCES, worked at Challenge Industries, visited the Skylight Club (the mental health clinic) and would frequent the Commons area in downtown Ithaca. He often slept overnight with a friend at his apartment, away from Evergreen. In considering the plaintiff’s move, she recognized that “H.O.M.E.S., Inc. did not have authority to prevent Mr. Tuttle from leaving the group home or the H.O.M.E.S. program altogether.”
The other care-givers who were consulted included the plaintiff’s case worker at the County Mental Health Depart *578 ment who agreed that the move to an intensive supportive apartment “should be started” though plaintiff should be closely monitored at the beginning. The BOCES day treatment counselor advised that: “Bill certainly has shown that he is capable of caring for himself in the community and has the necessary ADL [activities of daily living] skills to live more independently.” The counselor added that plaintiffs sometimes obstreperous behavior was a concern but concludes “since Bill appears determined to move out of Evergreen anyway, he should be given the chance to have supervised apartment living.” The Challenge Industries vocational counselor stated: “assuming his skill levels are sufficient * * * I would agree with the change.” Finally, a psychiatric social worker opined that plaintiff had the skills required for the intensive supportive apartment, but was “not sure” he could maintain an apartment and its social environment and would need to continue his involvement in Skylight Club and Challenge Industries.
These assessments, in general, support the intensive supportive apartment move, though they are tentative and even equivocal about the prospects for long-term success. In September 1992, H.O.M.E.S. staff members became concerned that certain of plaintiffs friends were taking advantage of his relative isolation by accepting gifts of money or property from him. On November 16th, the H.O.M.E.S. staff concluded that plaintiff needs: “more staff support and supervision than we are currently able to provide.” Accordingly, he was invited to move into a double apartment unit where a staff member would be on site 24 hours a day. Plaintiff refused. In consequence, H.O.M.E.S. issued a 30-day notice of intent to discharge him from his single apartment. This transition had not been accomplished by December 8th when the injury occurred.
No one has contended that H.O.M.E.S. had the right to exclude visitors from the plaintiffs apartment (c/. Mental Hygiene Law § 41.41 [2] [c]) and there is no evidence that defendant was aware of the identity or the proclivities of the visitor who, on December 8th, became the assailant. Moreover, as we have seen, at the time plaintiff was permitted to occupy a H.O.M.E.S. apartment, all the experts charged by society with responsibility for his rehabilitation program agreed that plaintiff had a potential to live in his own apartment, subject to continuing intermittent contact with his therapists and counselors.
*579 II. The Issue
The threshold issue, a question of law for the court, is fundamental: What duty, if any, did H.O.M.E.S. owe the plaintiff to protect him from the criminal acts of a third party who was not within the custody or control of H.O.M.E.S. and who was an invited guest in plaintiff’s apartment?
III. The Law
The provisions of article 41 of the Mental Hygiene Law, and the regulations of the Commissioner, established a new regime designed to transform the former system of treatment in large state-operated asylums to a community-based model which dramatically enlarges the liberties of those involved. Under the new dispensation, participants are no longer viewed as inmates. The statute confers upon them the same basic legal rights as others, “[ ]though some risk may be involved” (Mental Hygiene Law § 41.41 [2] [f]). The power of H.O.M.E.S. to regulate the minutia of plaintiffs social engagements and relations with others was extremely limited.
Courts have been reluctant to extend the liability of defendants for their failure to control the conduct of others (Waters v New York City Hous. Auth., 69 NY2d 225, 230; D’Amico v Christie, 71 NY2d 76, 88). “This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another” (Hamilton v Beretta U.S.A Corp., 96 NY2d 222, 233), “Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs” (Hamilton, supra, at 232).
Concededly, it was not unforeseeable that plaintiff, given his psychiatric condition, might encounter perils, beyond his ability to manage, while living independently. However, foreseeability alone does not establish the existence of a duty. It merely determines its scope, once the duty is deemed to exist (Eiseman v State of New York, 70 NY2d 175, 187; Pulka v Edelman, 40 NY2d 781, 785, rearg denied 41 NY2d 90). Even assuming, arguendo, the existence of a duty, there is no evidence to support the conclusion that the reckless or criminal proclivities of the plaintiffs friend were known, or reasonably should have been known, to defendant’s staff who were in almost daily contact with plaintiff. Under these circumstances, the ignition of the hair spray and its use as a flamethrower directed at plaintiff by a friend was not reasonably foreseeable and was an *580 intervening and superseding cause of the injury (Belinda L. G. v Fresh Air Fund, 183 AD2d 430).
Eiseman and Pulka (supra) involved a putative duty owed by defendants to a small circle of persons at potential risk, unlike the limitless number of those who sought protected status in Strauss v Belle Realty Co. (65 NY2d 399, 402-403). Nevertheless, in both Eiseman and Pulka, the Court of Appeals refused to impose a duty upon defendants who were not in a position to control the conduct of the tortfeasor.
Many of the public policy considerations operative in Eiseman are present in the case at bar. In Eiseman, as here, the defendant was the chosen instrumentality by which important state purposes were being served. In Eiseman, the college participated in the S.E.E.K. (Search for Education, Elevation and Knowledge) program, created by the Legislature to offer opportunities for higher education to the disadvantaged. Pursuant to that program, and the laws and policies of the state promoting the reintegration of former convicts into society, a paroled felon was admitted to the college. In the case at bar, H.O.M.E.S. was a key element in the community-based treatment plan created by the Legislature to reform and supersede the asylum system. In both cases, the State of New York accepted the fact that the administration of S.E.E.K., in connection with the parole system, and community treatment programs, involved a degree of risk. In Eiseman, the paroled student raped and murdered a fellow student. In the present case, a visitor to the plaintiff’s apartment, provided by H.O.M.E.S., inflicted a grievous injury.
The Court of Appeals, in Eiseman, rejected the argument that the college assumed a special duty to fellow students when admitting an ex-felon as part of the S.E.E.K. program. The Court noted that (1) the parolee “could have lived anywhere he chose, and otherwise enjoyed the rights of other citizens”; (2) S.E.E.K. was designed to further the public policy of the state promoting the reintegration of former convicts into society; and (3) imposing a special duty upon the college would mean that “former inmates cannot be returned to society without imposing on those who open doors to them the risk of absolute liability for their acts” (70 NY2d 190, 191). The analogy, of course, is not exact. Nevertheless, the policy reasons which militate against the imposition of liability upon H.O.M.E.S. are similar to those which justified the exoneration of the college. Those purposes would be seriously impaired or defeated by imposing upon H.O.M.E.S. the duty of an insurer in respect to *581 the safety of plaintiff and others similarly situated. We conclude that here, as in Eiseman, the defendant assumed no special duty to insure the plaintiffs safety.
The community care system has rescued the mentally and physically disadvantaged from the asylum system which, through inattention and even incompetence, had sometimes sunk to the level of Bedlam (cf. New York State Assn. for Retarded Children v Rockefeller, 357 F Supp 752). Reform, however, has come with a recognized price (Mental Hygiene Law § 41.41 [2] [b]). The absence of continuous and direct supervision, in the confines of a state institution, exposed the plaintiff to many hazards which, perhaps, might not occur in an asylum managed with appropriate vigilance. The plaintiffs claim assumes that H.O.M.E.S., operating under the state-mandated community care system, was in a position to control the plaintiffs interactions with others in his apartment (or elsewhere) and to regulate the conduct of visitors or to exclude visitors of questionable deportment (cf. Blatt v New York City Hous. Auth., 123 AD2d 591). These assumptions, as we have seen, are totally inconsistent with the philosophy of community care.
We conclude that H.O.M.E.S. owed no duty to prevent the incident of December 8, 1992. In the absence of a duty, the defendant’s failure to act more quickly or decisively to relocate the plaintiff from an apartment to a group home does not establish a sustainable negligence cause of action against H.O.M.E.S. (Eiseman, supra; Pulka, supra; McEnaney v State of New York, 267 AD2d 748, 752; Blatt v New York City Hous. Auth., supra).
The motion to dismiss the complaint must be granted.