[679 NYS2d 649]

Nabil Megally, Appellant, v Alfredo LaPorta et al., Respondents.

Second Department, November 2, 1998

36

**APPEARANCES OF COUNSEL**

*Phillips Nizer Benjamin Krim & Ballon, L. L. P.,* New York City (*William F. Reilly* and *Jeffrey L. Shore* of counsel), for appellant.

*Shaub, Ahmuty, Citrin & Spratt, L. L. P.,* Lake Success (*Steven J. Ahmuty* and *Kathleen Daly* of counsel), for Alfredo LaPorta, respondent.

*Mauro & Goldberg,* Great Neck (*Kenneth Mauro* and *Caryn Lilling* of counsel), for Nafees Khan Pervez, respondent.

*Bartlett, McDonough, Bastone & Monaghan, L. L. P.,* White Plains (*Edward J. Guardaro, Jr.,* of counsel), for Western Queens Community Hospital, respondent.

**OPINION OF THE COURT**

S. MILLER, J. P.

On this appeal we are asked to recognize, for the first time, the existence of a duty of care owed by physicians, not to a patient, but to a fellow physician who relied upon the diagnosis of his colleagues in the treatment of a patient. The precise issue to be determined is whether two pathologists and the hospital by which they are employed may be liable to a surgeon who allegedly performed an unnecessary mastectomy due to the pathologists' incorrect diagnosis of cancer. For the reasons that follow, we hold that the surgeon has no right of recovery as against the defendants.

The central facts underlying this appeal are as follows. In May 1995, Geraldine Barbarito (hereinafter the patient), consulted the plaintiff, Dr. Nabil Megally (hereinafter the surgeon), about a lump in her right breast. The surgeon referred the patient for a mammogram which reportedly revealed the presence of fibrocystic changes in her right breast.

On June 19, 1995, after the surgeon performed a biopsy of the patient's right breast, he informed her, in the operating room, that the tissue he had just removed appeared to be benign. He forwarded a specimen to the pathology lab of the defendant Western Queens Community Hospital (hereinafter the hospital). Later that day, the tissue specimen was examined by the defendant Dr. Alfredo LaPorta, at that time the director of the hospital's pathology lab, who concluded that the specimen was benign. However, the following day the specimen was again examined, this time by the defendant Dr. Nafees Khan Pervez, who determined that the specimen was malignant. Upon receipt of this report, the surgeon asked Dr. LaPorta to reexamine the specimen. Dr. LaPorta did so and reported to the surgeon that he was now of the opinion that the tissue was malignant. The surgeon then informed the patient of the pathologists' now unanimous conclusion of malignancy and that surgery involving the removal of her right breast was necessary.

On July 3, 1995, the patient obtained a second surgical opinion from Dr. Pantagiotis Manolas. Based upon the pathology reports of Drs. LaPorta and Pervez, Dr. Manolas, who did not obtain an independent pathology report, agreed that surgical intervention was necessary.

On July 10, 1995, the surgeon performed a modified radical right mastectomy. However, following the operation, further

pathological studies were conducted which indicated that no malignancy had existed. On September 6, 1995, the medical director of the hospital advised the patient that she never had breast cancer.

On or about October 30, 1995, the patient and her husband commenced an action to recover damages for medical malpractice against, among others, the surgeon, the pathologists, and the hospital. They alleged, *inter alia,* that the surgeon should have reviewed the pathology reports given his own preliminary belief that the tissue sample taken from the patient's breast was not malignant and that he failed to consider the value of a second, independent pathology review.

The surgeon served an amended verified answer wherein he generally denied the allegations of malpractice and asserted several generic affirmative defenses. He did not assert any cross claims against his codefendants.

In addition to commencing the action to recover damages for medical malpractice, the patient and her husband reportedly commenced a media campaign to publicize the allegedly negligent medical care she received. While the instant record offers few details, it is alleged that the patient and her husband were interviewed in newspapers and on television and radio. The surgeon, claiming to have been damaged in his practice and his reputation by the negative publicity, commenced this action against the pathologists and the hospital in or about April 1996.

The surgeon's verified complaint sounds primarily in negligence and medical malpractice. The thrust of the complaint was that, by reason of the pathologists' misdiagnosis, upon which he justifiably relied, the surgeon was caused to perform unnecessary surgery upon the patient, that the pathologists owed a duty to the surgeon "to exercise the requisite high degree of care, skill, and diligence expected to be possessed and exercised by physicians specializing in pathology", and that the pathologists breached that duty by negligently evaluating the patient's tissue sample and informing the surgeon that the patient had a malignancy. The operation performed by the surgeon in reliance upon the pathologists' report and the patient's bringing of a malpractice action allegedly resulted in "widespread media publicity", adversely affecting the surgeon's reputation. The surgeon claimed that the damage to his reputation caused him to suffer substantial economic losses, including surgery cancellations, loss of patients, and a substantial diminution in referrals from other physi-

cians. It also caused him to be investigated by the Department of Health, which in turn delayed his acceptance by several Health Maintenance Organizations, and to suffer tremendous embarrassment and humiliation as a result of the "media blitz". The complaint thus alleged the existence of a duty owed to the surgeon by the pathologists and the hospital, and that this duty was breached by the negligence of the defendants.

By separate motions, the pathologists and the hospital each moved for summary judgment dismissing the surgeon's complaint. The pathologists each acknowledged that they owed a duty of care with respect to the pathological services they rendered to the patient. They argued, however, that they owed no such duty of care to the referring surgeon. The hospital raised a similar argument in support of its motion. In the alternative, the defendants all argued that any trial of the surgeon's claims should be stayed pending the determination of the patient's underlying malpractice action.

In an order and annexed memorandum decision dated May 6, 1997 (172 Misc 2d 958), the Supreme Court granted the defendants' motions for summary judgment dismissing the complaint. Characterizing the surgeon's claims as sounding in negligent misrepresentation, the court held that the defendants did not owe a duty of care to the surgeon, a third person outside of the physician/patient relationship. The court further found that the surgeon's claimed economic injuries were not caused by the defendants, but were the result of the publicity sought by the patient and her husband. The court reasoned that the surgeon could not assert a negligence claim against the defendants in order to insulate himself from the patient's medical malpractice claim. From this order, and the judgment subsequently entered thereupon, the surgeon now appeals. We affirm.

■ The first step in determining whether the pathologists and the hospital owed the surgeon any relevant duty of care is to ascertain the theory upon which the surgeon seeks recovery. The surgeon's complaint most closely resembles one sounding in medical malpractice insofar as he charges that the pathologists and the hospital negligently misdiagnosed the patient as suffering from breast cancer (see, Flowers v Southampton Hosp., 215 AD2d 723; Maggio v Werner, 213 AD2d 883; Butler v Corines, 199 AD2d 455; Smith v Cruz, 161 AD2d 938; Schneider v Memorial Hosp. for Cancer & Allied Diseases, 100 AD2d 583). Indeed, where, as here, the claim of negligence is substantially related to medical treatment, the resulting cause of action

sounds in medical malpractice (*see, Petrillo v Leather,* 247 AD2d 368; *Chaff v Parkway Hosp.,* 205 AD2d 571; *Berger v State of New York,* 171 AD2d 713). However, it is generally recognized that liability for medical malpractice may not be imposed in the absence of a physician-patient relationship (*see, Finnegan v Devries,* 235 AD2d 454; *Miller v Sullivan,* 214 AD2d 822; *Ellis v Peter,* 211 AD2d 353; *Heller v Peekskill Community Hosp.,* 198 AD2d 265; *Violandi v City of New York,* 184 AD2d 364; *McKinney v Bellevue Hosp.,* 183 AD2d 563; *Lee v City of New York,* 162 AD2d 34; *Murphy v Blum,* 160 AD2d 914). Here, since there was no physician-patient relationship between the surgeon and the pathologists or the hospital, the surgeon may not recover on a theory of medical malpractice. The surgeon's reliance on *Tenuto v Lederle Labs.* (90 NY2d 606) is misplaced, as that case is easily distinguishable insofar as it recognized the duty of a physician to the parents of an infant patient, one of whom had contracted polio as a result of an innoculation administered to the child. The instant case presents no similar familial relationship and the surgeon is unable to cite any cases recognizing the existence of a duty under facts analogous to those at bar.

 Having ruled out any recovery on a theory of medical malpractice, we next consider the complaint as one sounding in negligence. Notwithstanding that the surgeon will need to resort to expert medical proof to establish the wrongdoing of the pathologists and the hospital (*see, e.g., Petrillo v Leather, supra*), to the extent that the complaint may be construed to assert causes of action of negligence, the theory of recovery is one of negligent misrepresentation.

As the Supreme Court aptly recognized, the surgeon has wholly failed to demonstrate the existence of any case law suggesting that the pathologists or the hospital owed him a duty of care vis-à-vis the medical treatment they rendered to the patient. The surgeon nevertheless urges that a duty should exist since he reasonably relied upon the pathologists' reports, as both doctors intended, and injury not only to the patient's health but to his reputation and economic circumstances foreseeably resulted from the pathologists' negligent misrepresentation. The surgeon further contends that public policy considerations should not preclude his claims since the extended duty of care would run only from doctor to doctor, and no proliferation of litigation would result.

Guided by the principles reiterated by the Court of Appeals, we find that no such duty exists. The existence of a duty is a

legal issue to be determined by the courts (*see, Eiseman v State of New York,* 70 NY2d 175, 187; *De Angelis v Lutheran Med. Ctr.,* 58 NY2d 1053, 1055). Foreseeability of injury does not equate with duty. Privity or a relationship akin to privity between parties is required. Factored into the determination of whether a duty exists are considerations of public policy (*see, Eiseman v State of New York, supra*).

In *Eiseman,* a prison doctor was charged with negligently failing to report a released prisoner's mental disorder, resulting in the prisoner's acceptance and enrollment in a State college, where he raped and murdered a college student. The Court held that no duty ran from the prison doctor to the student body, notwithstanding the college's foreseeable reliance upon the doctor's report. The Court held: "Foreseeability of injury does not determine the existence of duty (*Strauss v Belle Realty Co.,* 65 NY2d 399, 402) [, as u]nlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis * * * the duty owed by one member of society to another is a legal issue for the courts (*De Angelis v Lutheran Med. Center,* 58 NY2d 1053, 1055). 'While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that "the legal consequences of wrongs [are limited] to a controllable degree" ' (*Waters v New York City Hous. Auth.,* 69 NY2d 225, 229, quoting *Tobin v Grossman,* 24 NY2d 609, 619 * * *)" (*Eiseman v State of New York, supra,* at 187).

In the case before us, this Court's determination of the nature of the doctors' relationship to each other, i.e., whether privity or a relationship akin to it exists, is influenced by policy concerns. In that regard, we conclude that adverse consequences to the public would be inevitable were we to determine that a duty exists. Additional litigation would result in increased malpractice premiums, and an overburdening of the courts, all ultimately taxing the public. Each medical malpractice lawsuit might spawn another action by the named defendants for economic and related damages caused by colleagues' negligence. In addition, patients would not derive any additional benefit since a physician's liability to patients is clearly recognized based on a duty of care running from both the referring and the consulting physician to the patient. The only additional benefit would be to the physician who might recover not only contribution from his colleague but additional damages for loss of reputation and economic injury. We note

also that the Legislature has expressed significant concern regarding medical malpractice insurance premiums and their burdens to the public. The major objective of reform legislation enacted in 1985 was to moderate the cost of medical malpractice premiums (Mem of State Exec Dept in support of L 1985, ch 294, 1985 McKinney's Session Laws of NY, at 3022). Moreover, this extention of liability would affect not only the medical profession, but by analogy all professionals seeking opinions of other experts. Accordingly, recognition of the duty asserted by the surgeon would run contrary to public policy and Legislative intent. " 'In fixing the bounds of that duty, not only logic and science, but [also] policy play an important role' " (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402, *supra,* quoting *De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055, *supra*). "[I]t is * * * the responsibility of courts, in fixing the orbit of duty, 'to limit the legal consequences of wrongs to a controllable degree' " (*Strauss v Belle Realty Co., supra,* at 402, quoting *Tobin v Grossman*, 24 NY2d 609, 619, *supra*).

Certainly doctors must exercise due care in their treatment of patients (*see, Al Malki v Krieger,* 213 AD2d 331). To the extent that the surgeon may demonstrate his freedom from liability for the patient's injuries, he may attempt to shift the blame to his codefendants by asserting cross claims for contribution pursuant to CPLR article 14. In the absence of a recognized duty, however, he may not assert independent tort claims against his fellow practitioners for their alleged mishandling of a mutual patient's care (*see, Adams v Elgart,* 213 AD2d 436).

The surgeon contends that recovery may be permitted here pursuant to the rules of law recognized in commercial negligent misrepresentation cases. He attempts to analogize the instant matter to, *inter alia, Credit Alliance Corp. v Andersen & Co.* (65 NY2d 536), *Ossining Union Free School Dist. v Anderson LaRocca Anderson* (73 NY2d 417), and *Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood* (80 NY2d 377), where recovery has been permitted to parties who relied upon negligently prepared reports and opinions of, respectively, accountants, architects, and attorneys. However, in such cases, the reports of the defendants were prepared for the benefit, either direct or incidental, of the plaintiffs. Here, in sharp contrast, the diagnoses of the pathologists were provided for the exclusive, direct benefit of the patient, to whom the pathologist clearly owed a duty. While the surgeon may have reasonably relied upon the pathologists' final, unanimous conclusion

of malignancy, unlike the investors and other plaintiffs in the commercial negligent misrepresentation cases, the opinions of the pathologists were not rendered to benefit the surgeon, but the patient. Accordingly, not only has the surgeon failed to cite any precedents permitting recovery on a theory of negligent misrepresentation as between medical care providers, his reliance upon the aforecited distinguishable commercial negligent misrepresentation cases is seriously misplaced.

Even assuming that the surgeon could identify the existence of a recognized duty permitting him to recover for the alleged negligence of the pathologists or the hospital, we would still affirm the dismissal of his complaint since the damages he seeks to recover were not proximately caused by the defendants.

Like duty, proximate causation is a legal concept which stems from policy considerations intended to place manageable limits upon the liability that flows from negligent conduct (*see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 314; *Thomas v United States Soccer Fedn.,* 236 AD2d 600). Where the acts of third persons intervene between the defendants' conduct and the plaintiff's injury, liability turns on whether the intervening act is a normal or foreseeable consequence of the situation created by the defendants' negligence (*see, Derdiarian v Felix Contr. Corp., supra,* at 315; *Parvi v City of Kingston,* 41 NY2d 553, 560; *Smith v County of Nassau,* 232 AD2d 474). If the intervening act is extraordinary under the circumstances, unforeseeable in the normal course of events, or independent of the defendants' conduct, it may be a superseding act which breaks the causal nexus (*see, Di Ponzio v Riordan,* 89 NY2d 578; *Derdiarian v Felix Contr. Corp., supra; Martinez v Lazaroff,* 48 NY2d 819; *Ventricelli v Kinney Sys. Rent A Car,* 45 NY2d 950, *mot to amend remittitur granted* 46 NY2d 770; *Payne v Quality Nozzle Co.,* 227 AD2d 603). Moreover, while proximate causation generally presents an issue of fact for a jury's determination (*see, Benitez v New York City Bd. of Educ.,* 73 NY2d 650), where only one conclusion may be drawn from the established facts, proximate causation may be determined as a matter of law (*see, Derdiarian v Felix Contr. Corp., supra; Gomez v City of New York,* 249 AD2d 362; *Wright v New York City Tr. Auth.,* 221 AD2d 431).

Here, the surgeon seeks to recover pecuniary damages for loss of reputation and business, and damages for his emotional injuries. However, in both instances, the surgeon's alleged damages were not the result of the alleged malpractice of the defendants, but are directly attributable to the alleged media

campaign launched by the patient and her husband. Indeed, while the surgeon's complaint charges that "but for" the negligence of the pathologists and the hospital the unnecessary mastectomy would never have been performed, the complaint directly attributes the surgeon's alleged loss of income and damaged reputation to the "widespread media publicity". As his bill of particulars makes crystal clear, the surgeon acknowledged that his actual economic and noneconomic damages were the result of the media campaign. Clearly the defendants cannot be held to be responsible for the course of conduct of the patient and her husband in deciding to air their allegedly justifiable grievances in a variety of public forums.

Nowhere is it more apparent that the surgeon's claims are a square peg in a round hole than in an examination of the damages he seeks to recover. While his complaint most accurately sounds in medical malpractice, the damages he seeks are of a variety more commonly associated with a claim for defamation (*see,* 36 NY Jur 2d, Damages, § 116). However, by no stretch of the imagination may it rationally be concluded that the alleged negligence of the defendants was a proximate cause of the calculated, independent acts of the patient and her husband in publicizing the alleged facts of her case. Medical malpractice cases are unfortunately common in our society and the vast majority go unnoticed in the press. The egregious conduct allegedly underlying the patient's claims was particularly sensational in this case and the patient chose to air her grievances in public, as was her right to do so. Clearly, however, insofar as the surgeon's alleged damages all were directly caused by this extraordinary, external event, he may not seek to avoid the consequences of his own alleged malpractice by shifting the blame to the other health care providers involved. Indeed, as of yet, the patient's malpractice claims are unresolved and the surgeon has not demonstrated his freedom from liability. Even assuming, however, that the surgeon committed no malpractice, he may not cast the pathologists or hospital in liability for what were clearly the unforeseeable superseding acts of the patient and her husband (*see, Shatz v Kutshers Country Club,* 247 AD2d 375; *Brown v Middleton,* 244 AD2d 306; *Torres v Hallen Constr. Corp.,* 226 AD2d 364; *Huber v Malone,* 229 AD2d 469).

For all of the foregoing reasons, neither precedent nor policy persuade us to extend the liability of a consulting physician to his referring colleague. Accordingly, we find that the Supreme Court correctly dismissed the surgeon's complaint.

The surgeon's remaining contentions are without merit.

The appeal from the intermediate order must be dismissed because the right of direct appeal therefrom terminated with the entry of judgment in the action (*see, Matter of Aho,* 39 NY2d 241, 248). The issues raised on the appeal from the order are brought up for review and have been considered on the appeal from the judgment (*see,* CPLR 5501 [a] [1]). Therefore, the appeal from the order is dismissed, the judgment is affirmed, and the respondents are awarded one bill of costs.

SULLIVAN, FRIEDMANN and LUCIANO, JJ., concur.

Ordered that the appeal from the order is dismissed; and it is further,

Ordered that the judgment is affirmed; and it is further,

Ordered that the respondents are awarded one bill of costs.