[742 NYS2d 242]

Mary Ann McNulty, Respondent-Appellant, v City of New York et al., Respondents, and Montefiore Medical Center et al., Appellants-Respondents.

First Department, May 21, 2002

## APPEARANCES OF COUNSEL

*Gary Silverman* of counsel (*Anne Paxton* on the brief; *O'Dwyer & Bernstien, LLP,* attorneys), for respondent-appellant.

*Ronald E. Sternberg* of counsel (*Leonard Koerner* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for municipal respondents.

*Edward J. Guardaro, Jr.,* of counsel (*Bartlett, McDonough, Bastone & Monaghan, LLP,* attorneys), for appellants-respondents.

## OPINION OF THE COURT

NARDELLI, J.P.

In this appeal, we are asked to determine whether, in the absence of a physician-patient relationship, defendant physicians owed plaintiff a duty of care as that duty was defined by the Court of Appeals in *Tenuto v Lederle Labs.* (90 NY2d 606),

and later revisited by that Court in *Cohen v Cabrini Med. Ctr.* (94 NY2d 639).

Plaintiff Mary Ann McNulty, in December 1989, had been a registered nurse for three years and had been employed by defendant Montefiore Medical Center (Montefiore), in nursing or nursing-related capacities, since 1983. On December 24, 1989, at approximately 5:00 A.M., plaintiff received a telephone call from her friend Robin Reda's boyfriend, Louis Eschevaria, requesting that plaintiff immediately proceed to Ms. Reda's apartment because she was extremely ill. Ms. Reda is also a registered nurse and, at the time in question, was employed by defendant Jacobi Hospital (Jacobi), also known as Bronx Municipal Hospital Center.[1]

Plaintiff arrived at Ms. Reda's apartment at approximately 5:30 A.M. and noted that Ms. Reda was not oriented to time, person or place, was "unresponsive," and appeared to be in a "stupor" on the floor. Plaintiff assessed Ms. Reda's breathing, attempted to communicate with her, and became aware that Ms. Reda had been vomiting. During the period of time that plaintiff was attending to Ms. Reda, she was continually in close contact with her, often touching her and at times leaning only inches from her face.

Plaintiff, within five minutes of her arrival, called 911 and then phoned Ms. Reda's father to apprise him of the situation. While waiting for the ambulance to arrive, plaintiff cleaned and dressed Ms. Reda and then, accompanied by Mr. Eschevaria, followed the ambulance in her car to Jacobi's emergency room, arriving at approximately 6:00 A.M. Plaintiff subsequently spoke to the Emergency Medical Service (EMS) technicians who transported Ms. Reda in order to solicit their opinions as to what they believed was the nature of Ms. Reda's condition. One of the technicians purportedly informed plaintiff of a possible diagnosis of either meningitis or a drug overdose. Plaintiff testified at deposition that at that time, she was aware that there were contagious and noncontagious types of meningitis, but was unsure of the mode of transmission for the contagious type.

Plaintiff maintains that after the technicians left, she spoke to a Dr. Bellin, the emergency room physician employed by Jacobi who was treating Ms. Reda. Plaintiff avers that when Dr. Bellin first came out to speak to Ms. Reda's family members,

---

1. Jacobi Hospital is part of New York City Health and Hospitals Corporation (HHC).

he obtained a medical history for Ms. Reda, mentioned that a spinal tap had been performed, and echoed the EMS technician's possible diagnosis of a drug overdose or meningitis. After hearing that Ms. Reda's family intended to transfer Ms. Reda to defendant The Hospital of the Albert Einstein College of Medicine (Einstein), and that she was being treated for meningitis, plaintiff purportedly asked Dr. Bellin whether, in light of her exposure to the contagious disease, she needed medication or treatment. Plaintiff allegedly received no response from Dr. Bellin, "just like a shrug of his head. He didn't say yes. He didn't say no * * * He didn't say I will answer questions later."

Plaintiff, significantly, testified that after receiving what essentially amounted to a non-answer from Dr. Bellin, she did not question any other personnel at Jacobi about meningitis tests, did not ask to be seen by a doctor in the emergency room, and participated in a conversation with Mr. Eschevaria during which they concluded that "we would ask the doctors when we got to Einstein, to see if they could give us an answer" to the questions left unanswered by Dr. Bellin. Dr. Bellin testified at deposition that he did not recall seeing or speaking with anybody associated with Ms. Reda in the emergency room on the date in question and, specifically, did not recall speaking to an individual named Mary Ann McNulty.[2]

Ms. Reda was thereafter transferred to Einstein some time during the morning of December 24, 1989, at which time she came under the care of attending physicians Dr. Robert Shimm and Dr. Herbert Tanowitz. Plaintiff also proceeded to Einstein, where she remained for approximately three hours before returning home. Plaintiff contends that after Dr. Shimm spoke to Ms. Reda's family, she identified herself to Dr. Shimm and informed him that she had brought Ms. Reda to the Jacobi emergency room and had been with her the entire morning. Plaintiff maintains that she then asked Dr. Shimm if he felt she needed to be treated, to which he responded that no treatment was necessary. Dr. Shimm testified at deposition that he never spoke with plaintiff "to my knowledge."

Plaintiff testified, with regard to Dr. Tanowitz, that she returned to Einstein the following day, December 25, 1989, to visit Ms. Reda and encountered Dr. Tanowitz in Ms. Reda's room. Plaintiff contends that Dr. Tanowitz introduced himself, at which time Ms. McNulty explained that she and Ms. Reda

---

2. In fact, Dr. Bellin, other than acknowledging a "vague recollection" of Ms. Reda, recalled little else.

were good friends, that she had brought Ms. Reda to the hospital the day before, and that she had been in very close contact with Ms. Reda the previous day. Plaintiff testified that she then asked Dr. Tanowitz if she needed treatment, to which he replied that no treatment was required. Dr. Tanowitz denied speaking to plaintiff.

Dr. Shimm testified that after Ms. Reda's arrival at Einstein, he contacted the infectious disease department at Einstein, and then telephoned Jacobi's emergency room in order to ascertain whether they had contacted the Department of Health. Despite receiving an affirmative response, Dr. Shimm notified Einstein's administrative officer of the day in order to follow up on the Department of Health notification in order to make sure it had been carried out.

Dr. Tanowitz testified that the infectious control nurse on duty at Einstein that day, Grace Hrynus, who is now deceased, contacted the infectious disease control nurse at Jacobi once Ms. Reda's diagnosis of meningitis was confirmed in order to begin a joint effort to identify with whom Ms. Reda had come into contact. Dr. Tanowitz recalled that Ms. Hrynus identified approximately 25 individuals who needed prescriptions for prophylactic antibiotics and, toward that end, Dr. Tanowitz wrote a series of prescriptions for Ritempin, with the names left blank, to be completed and distributed by Ms. Hrynus. Plaintiff, however, was apparently never contacted by Ms. Hrynus or offered prophylactic medication.

Plaintiff maintains that on December 28, 1989, she awoke with a severe headache, joint and body pain and nausea and as a result, telephoned Dr. Shimm. Plaintiff claims that she reintroduced herself to the doctor, reminded him that she was Ms. Reda's friend and had brought her to the hospital, informed him that she was feeling very ill and inquired as to the type of meningitis that Ms. Reda had. Dr. Shimm purportedly explained that it was a very contagious type of meningitis and that if she was feeling ill, she should go to the hospital, after which he hung up on her. Plaintiff was subsequently diagnosed with bacterial meningitis (meningococcal meningitis), which allegedly left her deaf in one ear and hearing impaired with tinnitus in the other.

Plaintiff commenced the within action in February 1991, and, with leave of court, filed an amended complaint dated November 14, 1991, in which she alleged, inter alia, that defendants were negligent in their care and treatment of plaintiff by failing to provide prophylactic treatment to her

while in the process of providing care to Ms. Reda.[3] Defendants moved and cross-moved for summary judgment to dismiss the complaint asserting that a physician-patient relationship did not exist between defendant doctors and plaintiff and, in the absence of such a relationship, no duty was owed to plaintiff.

The motion court, in a decision and order entered June 8, 2000, dismissed the complaint as against Dr. Bellin and HHC concluding, inter alia, that no duty flowed from these defendants to plaintiff because plaintiff did not rely on what, essentially, was Dr. Bellin's non-advice; that Ms. Reda had not, at the time, been definitely diagnosed as suffering from meningitis; and that she admitted in her deposition testimony that she left Jacobi with the intention of seeking medical advice and/or treatment at Einstein Hospital.

With regard to Doctors Shimm and Tanowitz, the motion court found that an issue of fact existed as to whether they knew that "plaintiff was relying on their medical advice that she required no treatment and, as a result, whether there was a breach of a duty to warn." Finally, the motion court reasoned that although Montefiore and Einstein Hospitals could not be held vicariously liable for the acts of Doctors Shimm and Tanowitz, it would decline to grant summary judgment to Einstein, holding that it could be subject to liability for the acts of its nurse, Ms. Hrynus, who had been notified of plaintiff's contact with Ms. Reda but failed to notify plaintiff that Ms. Reda had meningitis and needed prophylactic treatment, despite notifying others who were similarly situated.

On appeal, plaintiff has abandoned the argument that a physician-patient relationship existed with the defendant doctors, a point she refused to concede at nisi prius, and now contends that the defendant doctors owed her a duty of care despite the absence of a physician-patient relationship. Defendants, on the other hand, maintain that no such duty exists and that to find such a duty, under the facts presented herein, would improperly expand the orbit of duty owed by a doctor to the community at large. We disagree.

It is firmly established that "[t]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case

---

**3.** Plaintiff's second cause of action, which was added in the amended complaint, asserts that defendants violated the New York State Sanitary Code (10 NYCRR 2.1 *et seq.*) which pertains to reporting, treating, warning and preventing the spread of communicable diseases.

* * * [and the] [f]ailure to make such showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853; *Zuckerman v City of New York*, 49 NY2d 557, 562; *Aetna Cas. & Sur. Co. v Island Transp. Corp.*, 233 AD2d 157).

In the matter at bar, a question of fact clearly exists as to whether plaintiff did or did not seek, and receive, medical advice and/or treatment from defendant doctors. The next step in our analysis, however, must be whether or not this disputed point of fact is relevant to the disposition of this case, for if defendant doctors owed no duty to plaintiff, as they claim, they may not be held liable in negligence (*see, Palsgraf v Long Is. R.R. Co.*, 248 NY 339, 342; *Turcotte v Fell*, 68 NY2d 432, 437; *Eiseman v State of New York*, 70 NY2d 175, 187). Indeed, "[i]n the absence of duty, there is no breach and without a breach there is no liability" (*Pulka v Edelman*, 40 NY2d 781, 782; *Petito v Verrazano Contr. Co.*, 283 AD2d 472, 473; *Ellis v Peter*, 211 AD2d 353, 355, *lv dismissed* 86 NY2d 885), or, as stated by Baron Pollock, and quoted approvingly by Chief Judge Cardozo, "[p]roof of negligence in the air, so to speak, will not do" (*Palsgraf v Long Is. R.R. Co., supra* at 341; *see also, Cunillera v Randall*, 196 AD2d 75, *lv denied* 84 NY2d 808).

Foreseeability of injury does not determine the existence of a duty and, unlike foreseeability and causation, which are generally factual issues to be resolved by the trier of fact, the existence and scope of an alleged tortfeasor's duty is a legal issue for the courts to determine (*Eiseman v State of New York, supra* at 187; *Eaves Brooks Costume Co. v Y.B.H. Realty Corp.*, 76 NY2d 220, 226), and it is the responsibility of the courts, in fixing the orbit of duty, " 'to limit the legal consequences of wrongs to a controllable degree' " (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402, quoting *Tobin v Grossman*, 24 NY2d 609, 619). The parameters by which the orbit is to be defined, however, are numerous, fluid, subject to the influences of public policy, and present no clear, bright line definition by which the courts are to be guided.

In fixing the bounds of a duty, "not only logic and science, but policy play an important role" (*De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055; *see also, Becker v Schwartz*, 46 NY2d 401, 408). In *Palka v Servicemaster Mgt. Servs. Corp.* (83 NY2d 579), the Court of Appeals observed that:

> "Common-law experience teaches that duty is not something derived or discerned from an algebraic

formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility. These sources contribute to pinpointing and apportioning of societal risks and to an allocation of burdens of loss and reparation on a fair, prudent basis * * *" (*id.* at 585; *see also, De Angelis v Lutheran Med. Ctr., supra*).

Chief Judge Cardozo, in *Palsgraf v Long Is. R.R. Co.* (*supra* at 344) instructed that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation."

Professors Prosser and Keeton have opined that:

"The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself." (Prosser and Keeton, Torts § 53, at 357-358 [5th ed].)

The learned authors further opined that with regard to the undefined limits of what constitutes the scope of duty:

"[I]t may be said that the courts have merely 're-acted to the situation in the way in which the great mass of mankind customarily react,' and that as our ideas of human relations change the law as to the duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others." (Prosser and Keeton, Torts § 53, at 359 [5th ed].)

Finally, but by no means conclusively, the Court of Appeals has recently restated the requirement that " 'the equation be balanced; that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to him' " (*Lauer v City of New York*, 95 NY2d 95, 100, quoting *Johnson v Jamaica Hosp.*, 62 NY2d 523, 527).

Bearing the foregoing principles and guidelines in mind, we first note that, generally, recovery for a physician's mal-

practice is predicated upon the existence of a physician-patient relationship, which is created when the professional services of a physician are rendered to, and accepted by another individual for the purposes of medical or surgical treatment (*Lee v City of New York*, 162 AD2d 34, *lv denied* 78 NY2d 863; *Heller v Peekskill Community Hosp.*, 198 AD2d 265). In this matter, plaintiff concedes the absence of a physician-patient relationship, but claims that under ordinary principles of negligence, and under the particular facts of this case, defendant doctors owed her a duty of care. We agree as to Doctors Shimm and Tanowitz.

In *Tenuto v Lederle Labs.* (90 NY2d 606, *supra*), plaintiffs Dominick and Elizabeth Tenuto presented their five-month old daughter to defendant doctor Leroy L. Schwartz for a second dosage of an oral poliomyelitis vaccine manufactured by defendant Lederle Laboratories. Lederle Laboratories included in its packaging of the vaccine a description of the precautions which should be taken against exposing vulnerable adults to "contact" polio, which results from contact with the feces or saliva of an individual who had received that particular form of polio vaccination.

Plaintiffs alleged that Dr. Schwartz, who was aware Dominick Tenuto was about to undergo elective surgery, never inquired as to whether he had been previously vaccinated against polio, nor advised plaintiffs of the risk of incurring contact polio and the precautions necessary to prevent exposure, especially in light of the surgical wound which would result from Mr. Tenuto's impending surgery. As a result, Mr. Tenuto was exposed to virulent polio viruses while caring for his daughter following his operation and was subsequently diagnosed as afflicted with polio, which rendered him a permanent paraplegic.

Plaintiffs brought a personal injury action, which the Supreme Court dismissed on Dr. Schwartz's motion, on the ground that plaintiffs' claims were based entirely on a failure to obtain the statutory informed consent mandated by Public Health Law § 2805-d, which claims could not lie because the Tenutos were not his patients. The Appellate Division affirmed for the same reason, but the Court of Appeals reversed, and found that the lower courts had read plaintiffs' allegations too restrictively and that "under the circumstances of this case * * * a duty of reasonable care extended to plaintiffs despite the absence of a direct doctor/patient treatment relationship between them and Dr. Schwartz" (*id.* at 612).

The Court in *Tenuto*, in reaching its conclusion, referred to its decision in *Eiseman v State of New York* (70 NY2d 175, 188), and stated that " '[i]n completing this particular report [of a physical examination of a patient], the physician plainly owed a duty of care to his patient and *to persons he knew or reasonably should have known were relying on him for this service to his patient*. The physician did not, however, undertake a duty to the community at large' " (*id.* [emphasis in original]). The Court in *Tenuto* also opined that a limited expansion of a physician's duty arises out of the existence of a special relationship, between either the physician and the injured nonpatient, or between the nonpatient and the patient, in those situations where the physician knew, or should have known, that the nonpatient was relying upon the physician's exercise of due care (*id.*, citing *Purdy v Public Adm'r of County of Westchester*, 72 NY2d 1, 8).

In determining that a duty existed in *Tenuto*, the Court noted that another well-established predicate for extending a physician's duty to third parties "is when the service performed on behalf of the patient necessarily implicates protection of household members or other identified persons foreseeably at risk because of a relationship with the patient, whom the doctor knows or should know may suffer harm by relying on prudent performance of that medical service" (*Tenuto v Lederle Labs., supra* at 613; *see also, Eiseman v State of New York, supra* at 188; *Miller v Rivard*, 180 AD2d 331, 337-338; Restatement [Second] of Torts § 324A [c]).

In this matter, an issue of fact exists as to whether Doctors Shimm and Tanowitz, after confirming that Ms. Reda was suffering from a highly contagious form of meningitis, were approached by plaintiff, informed of her close contact with the patient and, when questioned, rendered the advice that no treatment was, in fact, necessary. While we remain acutely aware of the necessity of limiting a physician's duty (*see, generally, Albala v City of New York*, 54 NY2d 269, 271-272), should the trier of fact resolve such issues in plaintiff's favor, we find that, under the particular facts of this case, a duty runs from Doctors Shimm and Tanowitz to plaintiff. Such a finding does not create a duty to the community at large but, rather, a duty which would flow only to plaintiff, for the facts, as presented by plaintiff, clearly indicate that Doctors Shimm and Tanowitz knew or should reasonably have known that plaintiff was relying on them for advice with regard to her exposure to a highly contagious, dangerous disease. We make no such finding with

regard to Dr. Bellin, however, as it is clear from plaintiff's own testimony that Dr. Bellin failed to give plaintiff a definitive answer when questioned, and that she did not rely on Dr. Bellin's non-advice, as she intended to seek a medical opinion once she reached Einstein.

To the extent that defendants attach significance to the fact that none of the authorities cited by the *Tenuto* Court impose a duty of care outside the patient's household, we again note that the Court of Appeals unequivocally stated that a physician's duty of care may be extended to third parties when the service performed on behalf of the patient "necessarily implicates protection of household members *or other identified persons foreseeably at risk because of a relationship with the patient * * *"* (*Tenuto v Lederle Labs., supra* at 613 [emphasis added]), and we perceive of no reason to refer to case law from another jurisdiction to clarify what the Court of Appeals has already made clear. Moreover, to the extent that defendants contend that no duty attaches simply because plaintiff was merely a close friend rather than a sibling, parent, or live-in aunt, to whom, in the same situation, a duty would apply, we decline to adopt such a proposition.

The Court of Appeals decision in *Cohen v Cabrini Med. Ctr.* (94 NY2d 639, *supra*) does not compel a different result. In *Cohen*, plaintiff-wife appealed the dismissal of her cause of action against her husband's physician for personal injuries arising out of a failed surgical procedure which was intended to enhance the husband's fertility. The husband's sperm count, however, actually dropped after the improperly performed surgery and as a result, plaintiff-wife could only be impregnated through in vitro fertilization, and underwent nine such procedures before one was successful. The Court of Appeals affirmed the dismissal of the nonpatient wife's claim for psychological harm attributable to her lost opportunity to achieve normal conception by her husband, as well as physical harm and pecuniary loss, and held that no duty could be imposed under the facts of that case based upon "a doctor-patient relationship between plaintiff and [the doctor] [for] [w]hile plaintiff did participate in her husband's consultation with the doctor, *no treatment or care of plaintiff was ever contemplated*" (*id.* at 642 [emphasis added]).

The Court in *Cohen*, as noted by defendants, did distill the critical factors present in *Tenuto*, but did not endeavor to make those factors exclusive and, in recognizing the fact-sensitive nature of these cases, quoted the principle extending the duty

of care to a third party, embodied in Restatement (Second) of Torts § 324A:

> "[O]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as *necessary for the protection of a third person* [or his things], is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care [to protect his undertaking], if * * *
>
> "(c) the harm is suffered because of *reliance* of the other or the third person upon the undertaking."
> (*Id.* at 643 [emphasis supplied].)

The *Cohen* Court then concluded that "[a]ny physical harm suffered by plaintiff from submitting to [in vitro fertilization] was the result of her voluntary election to undergo that additional procedure, over which [the doctor] did not and could not exercise any control. Contrastingly, in *Tenuto*, the *infant patient's parent did not contract polio because of any knowing, voluntary exposure to the disease but because the physician failed to warn and advise precautions against it. We decline to extend a physician's duty of care to insure the conferral of a benefit upon the wife of a patient under these circumstances*" (*id.* at 643-644 [emphasis added]).

In our view, the facts presented at bar fall comfortably within the guidelines established in *Tenuto*, which were reaffirmed in *Cohen*, as plaintiff herein clearly asserts that Doctors Shimm and Tanowitz, who were aware that Ms. Reda was suffering from a highly contagious form of meningitis, undertook, when questioned by plaintiff, to give her advice and that she consequently relied on that advice to her detriment.

As a result, we conclude that the motion court correctly denied summary judgment to Doctors Shimm and Tanowitz. The motion court also correctly concluded that Montefiore and Einstein may not be held liable for the purported malpractice of Doctors Shimm and Tanowitz, for it is well established that a hospital is not vicariously liable for the acts of an attending physician (*Walter v Betancourt*, 283 AD2d 223, 224; *Georges v Swift*, 194 AD2d 517, 518) absent certain circumstances not present herein. The motion court erred, however, in finding that Einstein may be held vicariously liable for the acts of its nurse, Grace Hrynus, who, after being informed by Ms. Reda of her contact with plaintiff, failed to notify plaintiff of the meningitis issue.

■ While it is true that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all" (*Glanzer v Shepard*, 233 NY 236, 239; *see also, Kingsland v Factory Mut. Sys.*, 145 AD2d 965, *lv dismissed* 74 NY2d 841), it is also true that there must be "misrepresentation by conduct and reliance thereupon" (*Kirshenbaum v General Outdoor Adv. Co.*, 258 NY 489, 497). Here, Einstein undertook to voluntarily perform a good deed as a matter of internal policy and we find that a cause of action does not accrue to those who were inadvertently overlooked and to whom no misrepresentation was made.

■ Finally, we find that the motion court correctly concluded that a private cause of action in medical malpractice against a medical practitioner does not arise out of alleged violations of the Public Health Law (*see, Landon v New York Hosp.*, 101 AD2d 489, 495-496, *affd* 65 NY2d 639).

Accordingly, the order of the Supreme Court, Bronx County (Douglas McKeon, J.), entered June 8, 2000, which, inter alia, granted the motion for summary judgment of defendants Montefiore, Einstein, Shimm and Tanowitz only to the extent of dismissing the second cause of action against Einstein, Shimm and Tanowitz and the entire complaint against Montefiore, and granted the cross motion for summary judgment of defendants Bellin and Jacobi in its entirety dismissing the complaint as against those defendants, should be modified, on the law, to the extent of granting summary judgment to Einstein, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant Einstein, dismissing the complaint as against it.

SAXE, J. (dissenting in part.) This Court has today expanded the legal duty of physicians beyond the boundaries established by recent Court of Appeals' pronouncements that have strictly limited the parameters of tort responsibility where a defendant has no direct, legally defined relationship with the plaintiff. While well intentioned and well presented, the majority's determination could have a detrimental impact on the practice of medicine. For these and other reasons, I respectfully dissent and present my views, in more detail, as follows.

On December 24, 1989, Robin Reda lay gravely ill in her Bronx apartment. Her distraught boyfriend telephoned plaintiff Mary Ann McNulty, a close friend of Ms. Reda's and a registered nurse, for help. Ms. McNulty arrived at Ms. Reda's apartment soon after the call, and found her pale, disoriented,

and appearing to be in a stupor, with indications that she had also been vomiting. Ms. McNulty attempted to assess Ms. Reda's breathing, during which time the two were in close proximity. She called 911, dressed Ms. Reda and waited for EMS to arrive. Ms. McNulty then followed the ambulance in her car, accompanied by Ms. Reda's boyfriend, to the Jacobi Hospital emergency room. Ms. McNulty testified at her deposition that upon her arrival at the emergency room she spoke to EMS technicians regarding Ms. Reda's condition, and one of them told her of a possible diagnosis of meningitis.

After the technicians left, Ms. McNulty asserts, she spoke with the Jacobi Hospital emergency room physician, Dr. Daniel Bellin, who informed her that Ms. Reda was being treated for meningitis, but did not respond to Ms. McNulty's inquiry as to whether she needed prophylactic antibiotics due to the close contact she had that morning with Ms. Reda.

Within a short period of time, Ms. Reda was transferred to defendant The Hospital of the Albert Einstein College of Medicine (Einstein),[1] where she came under the care of attending physicians Dr. Robert Shimm and Dr. Herbert Tanowitz. Ms. McNulty followed Ms. Reda and remained at Einstein for approximately three hours with Ms. Reda's family. During this period, Dr. Shimm spoke with Ms. Reda's family, and according to Ms. McNulty, at this time, she asked him directly whether she required any prophylactic treatment, and he replied that she did not. Dr. Shimm denied speaking with Ms. McNulty.

The next day, Ms. McNulty returned to Einstein to visit Ms. Reda, and while there spoke with Dr. Tanowitz, who happened to be in Ms. Reda's room at the time. According to Ms. McNulty, she informed Dr. Tanowitz of the nature of her contact with Ms. Reda and asked if she needed treatment; according to Ms. McNulty, Dr. Tanowitz said that she did not, although he did not recall speaking to Ms. McNulty. Ms. McNulty took no further action at that time. She asserts that at the time she knew that there were contagious and noncontagious types of meningitis, but did not know how the contagious type was transmitted and was unaware of what tests were necessary in order to make a diagnosis.

Although the infection control nurse employed by Einstein, Grace Hrynus, took steps to contact and provide prophylactic

---

1. Einstein Hospital is owned, operated and controlled by defendant Montefiore Medical Center.

treatment for those who had been in contact with Ms. Reda, Ms. McNulty was neither contacted nor offered a prescription for prophylactic medication.[2]

On December 28, 1989, Mary Ann McNulty awoke with a bad headache, body aches and nausea. She called Dr. Shimm and inquired about the type of meningitis Ms. Reda had been treated for, and was informed that it was a very contagious type and that she should go to a hospital. Her own physician then instructed her to go immediately to Montefiore Hospital emergency room. Ms. McNulty was diagnosed with and treated for meningococcal meningitis, but the disease left her deaf in one ear, and with mild hearing loss and tinnitus in the other ear.

Ms. McNulty sued, claiming that each defendant committed malpractice by failing to ensure that she received prophylactic treatment at the time of Robin Reda's diagnosis.

Each of the defendants moved for summary judgment dismissing the complaint, arguing, inter alia, that they owed no duty to plaintiff since she was not a patient.

The motion court granted dismissal as against defendants Dr. Bellin and New York City Health and Hospitals Corporation, of which Jacobi Hospital is a part, reasoning that they owed no duty to plaintiff as a patient and that given Ms. Reda's transfer to another hospital prior to a definitive diagnosis, plaintiff could not show that she had relied upon Dr. Bellin to provide medical advice.

As to Drs. Shimm and Tanowitz, the motion court perceived questions of fact as to whether they had misinformed Ms. McNulty that she did not require treatment; as to Einstein, the court found questions of fact as to whether through Nurse Hrynus it had acted negligently in failing to provide prophylactic treatment to Ms. McNulty. I conclude that this aspect of the ruling creates so broad a duty on the part of a physician as to be legally unsustainable.

Discussion

The important issue raised on this appeal is whether physicians and hospitals owe any duty of care to a nonpatient, where that nonpatient identifies herself as a friend of a patient, who participated in caring for and transporting the patient to the hospital shortly before the patient was diagnosed with a highly contagious disease. To decide the issue, we must first consider

2. Grace Hrynus was deceased by the time the depositions were conducted.

the extent to which physicians owe *any* duty toward others besides their own patients. Of course, "[u]nlike foreseeability and causation, both generally factual issues to be resolved on a case-by-case basis by the fact finder, the duty owed by one member of society to another is a legal issue for the courts" (*Eiseman v State of New York*, 70 NY2d 175, 187, citing *De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055).

Regarding Dr. Shimm and Dr. Tanowitz

> " '[I]t is generally recognized that liability for medical malpractice may not be imposed in the absence of a physician-patient relationship' (*Megally v LaPorta*, 253 AD2d 35, 40 [citations omitted]). Such a relationship 'is created when the professional services of a physician are rendered to and accepted by another for the purposes of medical or surgical treatment' (*Lee v City of New York*, [162 AD2d 34, 36, *lv denied* 78 NY2d 863] [citation omitted])."
> (*Zimmerly v Good Samaritan Hosp.*, 261 AD2d 614, 614.)

This basic statement of policy regarding the limitations of liability for medical malpractice reflects what our society expects from those practicing medicine. The duties imposed by law on the physician are serious and substantial, frequently involving life-or-death decisions. The essential focus of physicians' work is, and should be, the treatment of their own patients. Indeed, our case law has emphasized that only those physicians who provided care to the patient (or supervised a physician who provided care) may be liable to the patient; a physician's partners, regardless of their knowledge of the patient's case, have no duty toward the patient (*see, Sawh v Schoen*, 215 AD2d 291, 292). A court should therefore proceed most carefully before imposing legal duties upon physicians toward nonpatients, since an expansion of physicians' responsibilities may have broad societal repercussions. For example, imposition of any such duty could lead to the undesirable "practice of 'defensive medicine' " (*see, Albala v City of New York*, 54 NY2d 269, 274), by which the need to act so as to avoid potential liability toward third parties prevents the physician from focusing solely on providing the best treatment for the patient.

Plaintiff now concedes that no physician-patient relationship existed between defendants and herself. Indeed, it is clear that they rendered no professional medical services to Ms. McNulty. Nevertheless, because under limited and narrowly-drawn conditions, physicians have been held to owe a duty to nonpa-

tients such as immediate family members who have a special relationship with the physician, we must consider whether plaintiff stands in such a position.

The analysis as to whether defendants had any duty toward plaintiff must carefully focus on the consequences of imposing such a duty. "Courts resolve legal duty questions by resort to common concepts of morality, logic and consideration of the social consequences of imposing the duty" (*Tenuto v Lederle Labs., Div. of Am. Cyanamid Co.*, 90 NY2d 606, 612; *Cohen v Cabrini Med. Ctr.*, 94 NY2d 639, 642). It should be recognized at the outset that the potential consequences of imposing upon physicians a duty toward the friends and relatives of a contagious patient are so wide-ranging as to warrant rejection of such an encompassing duty under which physicians treating patients for contagious diseases might potentially be liable to an indefinite number of people. The resulting burden would be particularly unreasonable on emergency room physicians and those specializing in infectious disease.

Moreover, review of this state's jurisprudence on the issue of a physician's duty toward a nonpatient discloses that the existing law is "narrowly drawn," even with regard to the duty owed to a patient's *immediate family* (*see, Cohen v Cabrini Med. Ctr.*, 94 NY2d 639, 643). "Although in limited circumstances a physician's duty of care has been extended to a patient's family members, our courts have been especially circumspect in doing so" (*id.* at 642). Plaintiff cites no authority in which a physician owed a duty of care toward a friend of the physician's patient.

Plaintiff relies primarily upon *Tenuto v Lederle Labs., Div. of Am. Cyanamid Co.* (90 NY2d 606), particularly emphasizing the following language:

> "Another well-established predicate for extending a physician's duty of care to third parties is when the service performed on behalf of the patient necessarily implicates protection of household members *or other identified persons foreseeably at risk because of a relationship with the patient*, whom the doctor knows or should know may suffer harm by relying on prudent performance of that medical service [citations omitted]." (*Id.* at 613 [emphasis added].)

Plaintiff extracts from the foregoing sentence the phrase "other identified persons foreseeably at risk," deriving from those

words a rule imposing upon a physician a duty toward *any* nonpatient known to the physician as foreseeably at risk because of a relationship with the patient. However, this interpretation of the *Tenuto* holding would constitute an expansion of a physician's duty beyond the Court's ruling there, and beyond what is appropriate to impose upon the medical profession.

In *Tenuto*, the defendant physician was held to owe a duty to the parents of an infant patient who had been given an oral polio vaccine, based upon the allegation that "administration of oral polio vaccine to an infant creates a well-recognized danger to parents of incurring contact polio, particularly to a parent of special vulnerability as claimed here." (*Id.* at 613-614.) The Court reasoned that "[p]laintiffs fall within a determinate and identified class—immediate family members—whose relationships to the person acted upon have traditionally been recognized as a means of extending *and yet limiting* the scope of liability for injuries caused by a party's negligent acts or omissions" (90 NY2d at 614, *supra* [emphasis added]).

To the extent that the *Tenuto* decision left the impression that physicians may owe a duty generally to their patient's immediate family members and others, the Court in *Cohen v Cabrini Med. Ctr.* (*supra*), less than three years later, clarified the stringent limits of when even immediate family members may claim malpractice. In *Cohen* the Court considered whether its ruling in *Tenuto* required upholding a claim by a nonpatient wife against her husband's physician following a failed surgical procedure intended to enhance the husband's fertility. The wife claimed damages attributable to her loss of opportunity to achieve normal conception by her husband. Although the physician was certainly aware of the wife and the possible effects upon her if he performed the procedure in a negligent manner, the Court affirmed the dismissal of her claim. The Court identified three critical factors that were present in *Tenuto*, supporting the extension of the physician's duty of care to the parent of the infant patient: (1) the parent had engaged the infant's physician and relied exclusively on his advice, (2) it was the physician's acts in administering the vaccination to the infant that created the serious risk of harm to the parent, and (3) the physician knew or should have known that the failure to warn the parent of the serious peril heightened the risk (*Cohen, supra* at 643).

It then went on to explain that the foregoing factors supported the imposition on physicians of a duty toward nonpa-

tient wives in prior cases where wives had claimed physical injuries resulting from an unwanted pregnancy after a negligently performed vasectomy on their husbands (*id.*, citing *Miller v Rivard*, 180 AD2d 331; *Weintraub v Brown*, 98 AD2d 339; *Sorkin v Lee*, 78 AD2d 180; *appeal dismissed* 53 NY2d 797). Specifically, in those cases, the procedure was undertaken for the specific purpose of preventing the physical harm to the wife that resulted from the unwanted pregnancy; both patient and wife together relied upon proper performance, and the physical harm was a direct outcome of the malpractice (*id.*).

Concluding that the factors that had been present in both *Tenuto* and the negligent vasectomy cases were absent in *Cohen*, the Court concluded that extending a duty of care to the nonpatient wife in *Cohen* "would be an unwarranted extension of our *narrowly drawn* jurisprudence with respect to malpractice liability to a patient's family member" (94 NY2d at 643, *supra* [emphasis supplied]).

Not only does the *Cohen* decision clarify the limits of *Tenuto*, but it should be noted that in none of the authorities cited in *Tenuto* was a physician's duty of care imposed on anyone outside the patient's household. For instance, in *Davis v Rodman* (147 Ark 385, 227 SW 612), the nonpatient to whom a duty of care was found was the *son* of the patient. Although the court indicated that physicians should advise "the family *and others*, who are liable to be exposed" to typhoid fever, it went on to rely upon the assertion that the relation of a physician to his patient "and *the immediate family* is one of the highest trust" (*supra*, 147 Ark at 391, 227 SW at 614 [emphasis added]). There is no language in the remainder of the decision that reflects an intent to apply the ruling to "others" generally. Similarly, in *Bradshaw v Daniel* (854 SW2d 865 [Tenn]) a physician's duty was also extended to an immediate family member. The defendant physician had treated a man who ultimately died of a contagious disease. Although the physician communicated with the wife during her husband's treatment, he never advised her of the risks of exposure to her husband's disease or that it could have been the cause of his death.

In *DiMarco v Lynch Homes-Chester County, Inc.* (525 Pa 558, 583 A2d 422), the nonpatient was the patient's sexual partner; the defendant physicians had specifically assured their patient, who had been exposed to hepatitis, that if she remained symptom-free for six weeks, then she had not contracted the disease; however, they failed to warn her to

avoid sexual relations for six months after exposure. The patient abstained from sexual relations for eight weeks, but thereafter passed her disease on to the plaintiff. The court hold that "if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician" (*supra*, 525 Pa at 562, 583 A2d at 424).

In *Skillings v Allen* (143 Minn 323, 173 NW 663), the court extended the duty of care to the *parents* of the patient. Finally, in *Edwards v Lamb* (69 NH 599, 45 A 480), the court extended the duty of care to the *wife* of the patient. Moreover, in *Edwards* the defendant physician's conduct affirmatively created the risk to the nonpatient, as the doctor directed the wife to assist in dressing a wound on her husband, knowing that there was a danger of infection but negligently assuring her that there was none.

Thus, even where cases from other jurisdictions imply that other nonpatients besides family members may have a right to bring a malpractice claim, that category of nonpatients could, at most, conceivably include such people as live-in caretakers or domestic partners. To contemplate that the term "others" could cover friends of the patient is to create a new and almost limitless category of possible plaintiffs.

Applying the case law to the present case, the responsibility of these defendant physicians was to diagnose and treat the patient, Ms. Reda, and their conduct in doing so is not alleged to have been performed negligently or in a manner causing harm or creating additional risk to Ms. McNulty. No special relationship existed between Ms. McNulty and the physicians, such as existed between the pediatrician and the infant's parents in *Tenuto*, or the at-risk wives and the surgeons performing vasectomies on their husbands in *Miller*, *Weintraub* and *Sorkin*.

Indeed, the circumstances presented here are comparable to those in *Ellis v Peter* (211 AD2d 353, *lv dismissed* 86 NY2d 885), in which the Second Department dismissed a wife's claim for malpractice against her husband's physician, which had been based upon the physician's failure to diagnose her husband's case of tuberculosis and the resulting failure to warn her of the need to take action to avoid contracting it. The Court explained:

> "[W]ere we to extend the defendant's duty of care
> to the wife under these circumstances, we perceive

no demarcation of the point where that duty would end. In other words, if the physician owes a duty to a patient's spouse to warn her about his patient's condition, such a duty would also logically extend to other individuals with whom the patient was in close contact such as other relatives, e.g. his children, co-workers, or even fellow commuters. Clearly such individuals represent the 'community at large' to whom a physician owes no duty of care. Thus, the imposition of a common-law duty upon the defendant herein with respect to the wife could 'expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs.'" (211 AD2d, *supra* at 356 [citation omitted].)

Further, in response to the wife's argument that it was foreseeable that she would be in the zone of risk for contracting the disease from her husband, the Court explained that "[f]oreseeability should not be confused with duty" (211 AD2d at 356, quoting *Pulka v Edelman*, 40 NY2d 781, 785). The Court therefore concluded that there was simply no duty owed by the physician directly to the patient's wife.

The same policy applies here: imposing a duty of care upon a physician toward those individuals with whom a contagious patient has had contact would "create an almost infinite universe of potential plaintiffs" (*id.*).

Nor may Ms. McNulty create a duty not otherwise in existence by relying upon her claim that she made herself known to Ms. Reda's doctors. In other words, Dr. Shimm and Dr. Tanowitz, who otherwise had no duty toward her, cannot have acquired such a duty by the simple expedient of her approaching them to inform them of her circumstances and inquiring as to whether she needed prophylactic treatment. Since her conduct did not create an independent physician-patient relationship—and she now concedes that it did not—it would be incongruous to permit that same conduct to create the equivalent duty toward her.

Indeed, allowing a physician's duty to a nonpatient to be premised upon the nonpatient's simply identifying herself as having been in close contact with the physician's contagious patient and asking the treating physician for medical advice, would unduly broaden the "universe of potential plaintiffs" (*id.*). If a physician must respond to a nonpatient in such circumstances as if she were a patient, it is a small step to the

imposition of such a duty whenever a physician becomes aware of a person who had been in close contact with a contagious patient, even in the absence of a direct request for advice by the nonpatient. There is no logical reason to make the physician's duty dependent upon whether the person at risk thought to ask a direct question.

What is necessary before imposition on a physician of a duty toward a nonpatient is a "special relationship" (*see, Tenuto, supra* at 612). Plaintiff's asserted conduct is not enough to create such a relationship and its concomitant duty.

I note that the concern here expressed for strictly limiting a physician's duty to that owed either directly to the patient or to those others with whom a special relationship exists, is fully consonant with jurisprudence in this state in other areas of tort liability. The need to prevent the possibility of virtually limitless liability has arisen, for instance, regarding claims of financial injury caused by reliance on negligently prepared financial reports: only a plaintiff in privity with the preparer of the report, or one in sufficient contact with the preparer of the report as to demonstrate a relationship "approaching privity," may claim damages resulting from such negligence, regardless of the foreseeability of the injury (*see, Eiseman v State of New York*, 70 NY2d 175, 188). "We have limited the universe of permissible plaintiffs because a failure to do so would impose a duty of reasonable care enforceable by any member of an indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured by any negligence" (*id.*).

The Court of Appeals has also engaged in "[p]olicy-driven line-drawing" recently to preclude claims of purely economic losses against landowners and contractors following a building collapse (*see, 532 Madison Ave. Gourmet Foods v Finlandia Ctr.*, 96 NY2d 280, 291). There, too, the indeterminate nature and extent of the possible plaintiffs and injuries makes the potential for liability so broad as to require the drawing of a line as a matter of policy, by which those plaintiffs claiming resultant physical injury or property damage may proceed with a claim, while those claiming solely economic losses may not (*id.*).

For the foregoing reasons, Drs. Shimm and Tanowitz owed no duty to Ms. McNulty as a matter of law, and therefore, in my view, her claims against them should have been dismissed. The same holds true, of course, for Dr. Bellin, and based both on this point and upon the absence of any showing of reliance,

I therefore concur with the majority's affirmance of the branch of the order on appeal dismissing the claim against Bellin and New York City Health and Hospitals Corporation.

Regarding Montefiore and Einstein Hospital

The ruling that issues of fact exist as to whether Einstein, and by extension, Montefiore, may be held liable for negligence based upon the failure of Einstein staff to successfully find and treat Ms. McNulty, was also in error.

Of course, the hospital may not be held vicariously liable for the alleged negligence of Drs. Shimm and Tanowitz, not only due to the absence of any duty on their part, but because they were independent contractors directly retained by the patient (*see, Hill v St. Clare's Hosp.*, 67 NY2d 72, 79). Furthermore, the efforts made by hospital staff to contact those people who had come into contact with Ms. Reda prior to and during her hospitalization and advise them of the need to obtain medication to prevent infection do not establish that Einstein had a duty to do so.

Although a hospital may be held vicariously liable for the negligence of its employees (*see, Hill v St. Clare's Hosp.*, *supra*), the failure of Nurse Hrynus to contact Ms. McNulty does not support a finding of negligence on the part of Hrynus or Einstein. The task of attempting to locate all at-risk contacts of the patient, while salutary, was a voluntary undertaking by Einstein; it had no duty to do so, nor had Ms. McNulty any reason to rely on Einstein to do so.

While liability may be imposed for gratuitous undertakings negligently performed (*see, Home Mut. Ins. Co. v Broadway Bank & Trust Co.*, 53 NY2d 568, 575; *Hochberg v Riverbay Corp.*, 230 AD2d 680, 681), this rule applies where there is affirmative negligence toward the individual to whom the voluntary undertaking was extended. The gravamen of the wrong is that the injured plaintiff was misled into relying upon a representation (by word or conduct) that something would be done on his behalf (*see, Kirshenbaum v General Outdoor Adv. Co.*, 258 NY 489, 497). Another circumstance supporting liability is where the voluntary act left the plaintiff in a worse position than if nothing had been done (*see, id.*). Here, however, no form of communication was made to plaintiff by any hospital employee, nor did hospital staff create a danger to her that had not previously existed. Therefore there can be no liability on this basis.

That the hospital voluntarily undertook to do something salutary as a matter of internal policy, should not be permitted

to give rise to a cause of action to those who were inadvertently left out.

Accordingly, I would dismiss the claims against defendants Shimm, Tanowitz, Einstein and Montefiore.

LERNER and RUBIN, JJ., concur with NARDELLI, J.P.; SAXE and MARLOW, JJ., dissent in part in a separate opinion by SAXE, J.

Order, Supreme Court, Bronx County (Douglas McKeon, J.), entered June 8, 2000, modified, on the law, to the extent of granting summary judgment to The Hospital of the Albert Einstein College of Medicine, and otherwise affirmed, without costs.